Argued and submitted February 3, affirmed April 7, 1981

In the Matter of Swartzfager,
Debbie, a child,

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Petitioner,*

*v.*

JONES,
*Respondent.*

(No. 59275, CA 16087, SC 27346)

626 P2d 882

Karen H. Green, Assistant Attorney General, Salem, argued the cause for petitioner. With her on the briefs were James M. Brown, Attorney General, John R. McCulloch, Jr., and Walter L. Barrie, Solicitors General, and William F. Gary, Deputy Solicitor General, Salem.

Lee M. Hess, Portland, argued the cause for respondent. With him on the brief was Swire & Riebe, Portland.

Before Denecke, Chief Justice, and Tongue, Lent, Linde, Peterson and Tanzer, Justices.

TONGUE, J.

**TONGUE, J.**

This is a proceeding for termination of parental rights based upon a petition which alleged, among other things, (1) that the mother had "failed and neglected without reasonable and lawful cause" to provide for her daughter "for more than one year prior to the date of this petition" (ORS 419.523(3)), and (2) that "the mother is unfit by reason of conduct or condition seriously detrimental to (the daughter)" because, among other things, "the mother suffers from mental or emotional illness * * *." (ORS 419.523(2)).

The state appealed to the Court of Appeals from an order by the juvenile court denying the state's petition. The Court of Appeals, by a divided court, affirmed the juvenile court by an opinion holding that although the mother had failed and neglected to provide for the child's needs for the year prior to filing the petition, there was a "reasonable and lawful excuse" for such failure in that during that period she had suffered from systemic lupus erythematosus. 48 Or App 205, 616 P2d 572 (1980). Four members of that court joined in a dissenting opinion stating, among other things, that the mother will never recover her health, but "will always have the same *excuse,* and Debbie will never have a chance" and that under the majority opinion:

> "A failure or neglect to provide for a child once initiated can never be subjected to the statutory policy if during any substantial period of time afterwards the parent or parents have an excuse for continuing to act as they initially acted — even if there is no evidence that the parent or parents would have acted differently in the absence of the excuse."

We allowed the state's petition for review because of our concern over the problem raised by that dissenting opinion, as well as what appeared to be a problem arising from the fact that the Court of Appeals did not by its opinion discuss the second contention by the state, namely, that the mother was unfit by reason of mental or emotional illness.

*The Facts*

1. *Mother's leaving of Debbie on moving to California.*

Mrs. Jones, Debbie's mother, also has two older sons. The younger son lived with her and the older son with

her parents. She had twice previously committed herself for psychiatric hospitalization. On one previous occasion both Debbie and the younger son had been placed in foster care while Mrs. Jones was in a hospital and they remained there for over a year.

In February 1977, Mrs. Jones, together with her husband, her younger son Michael, and Debbie were staying with a friend, a Mrs. Davenport, while they were waiting for a check before moving to California. During that time, according to Mrs. Davenport and her daughter, Cathy Valle, Mrs. Jones showed great affection for Michael, but little for Debbie, who she would usually leave when she went out, taking Michael with her, and making Debbie cry quite often.

On or about March 2, 1977, Mr. and Mrs. Jones loaded their belongings in a truck and drove to California, taking Michael but leaving Debbie, then eight years of age, with Cathy Valle. The evidence is conflicting as to the reason why Debbie was left behind. According to Mrs. Davenport, Mrs. Jones said it was because there wasn't room in the truck, although Cathy Valle said that they could have taken her and left some boxes to be shipped to them. Mrs. Jones gave different reasons for leaving Debbie, telling a social worker and a doctor that she left Debbie because Debbie was ill, but testifying that she only did so because she was prevented from taking Debbie by her husband, who threatened to beat her.

According to Mrs. Davenport and Cathy Valle, they were told by Mrs. Jones that she would send for Debbie soon and would send money for her plane or bus fare. According to Mrs. Jones, Cathy Valle was going to drive soon to Mexico and would then bring Debbie to California. This was denied by Cathy Valle.

About a week later, according to Cathy Valle, Mrs. Jones called to say that "they had had some problems" but would send money for Debbie, which they never did. She also testified that she did not hear again from Mrs. Jones; that she tried without success to call Mrs. Jones in California, and finally turned Debbie over to the juvenile authorities. On March 30, 1977, Debbie entered foster care.

Mrs. Jones testified, however, that she sent $200 to Cathy Valle for Debbie's plane fare and later kept trying to call Cathy Valle, but was finally told that the number was disconnected. She said that she contacted the police and welfare authorities for help in locating Debbie, both before and after going to the hospital on May 2, 1977 (as later discussed).

According to social workers assigned to the case, numerous efforts were made by them to communicate with Mrs. Jones by mail, including a letter dated March 31, 1977, informing Mrs. Jones that a petition had been filed, apparently for commitment of Debbie to Children's Services Division, and that only one letter was received from her. That letter, dated April 12, 1977, stated that she loved Debbie and would "do anything" to get Debbie back; that she had "just gotten a job" and was going to send for Debbie with her first pay check. Apparently, however, that was not done and no letters were received from Mrs. Jones in response to further letters addressed to her.

2. *The intermittent hospitalization of Mrs. Jones beginning in May 1977 - Psychiatric evaluation of Mrs. Jones and Debbie.*

Mrs. Jones became seriously ill sometime between March 2, 1977, and May 2, 1977, when she was admitted to a hospital in California and diagnosed as suffering from systemic lupus erythematosus. Lupus was described as a rheumatological disease primarily of young women and one which can also affect the central nervous system. According to the medical testimony, some of the manifestations that are common include not only severe pain, but "aberrant behavior," hallucinations, schizophrenia, depression and anxiety, and it can also result in memory loss. There was also medical testimony that it is "very probable" that the behavior of Mrs. Jones in abandoning her daughter was "related to the diagnosis of lupus." In addition, there was medical testimony that the psychiatric problems caused by lupus are "not necessarily permanent"; that persons afflicted with lupus may have periods of both remission and exacerbation and that during periods of remission such a person can function normally and responsibly.

According to hospital records, Mrs. Jones was hospitalized for lupus not only from May 2 to 5, 1977, but also from May 15 to 17, 1977; from October 19 to 27, 1977; from December 19, 1977 to January 3, 1978; from February 17 to 21, 1978; from April 5, 1978 to May 16, 1978; from August 3 to 18, 1978, and from December 2 to 8, 1978.

A psychiatrist called by the state as a witness, based upon his "evaluation" of Mrs. Jones in August 1979, testified that she was cooperative and neatly dressed; that he gave her what he described as an "MMPI test," the results of which were not "valid" because she had "preconceived notions" and "presented herself in a sort of a rosy light"; that he had never treated lupus, but that in his opinion Mrs. Jones "is not going to change" and "doesn't learn from her experiences." He also testified that her history shows that she is mentally ill and that although she is functioning as a competent parent to her son and possibly could take proper care of her daughter, it was "improbable," in his opinion, that she would do so, although recognizing that a negative relationship with her daughter does not necessarily make a parent incapable of parenting. In addition, he testified that Debbie is not an ordinary child, but one who had "problems" as a result of "rejection" by her mother, requiring "super-mothering" which Mrs. Jones was not able to do, and that further rejection by her mother would have a seriously detrimental effect on Debbie (who apparently had not been "evaluated" by him).

The state also called as a witness another psychologist, who made evaluations of Debbie, then in a foster home, on March 6, 1978, and August 27, 1979. He testified that she had feelings of rejection as a result of her mother not keeping her promise to send for her; that, in his opinion, she is a "damaged child" who is likely to become involved in delinquent behavior unless provided with adequate stability and security; that lupus cannot cause a mother to favor one child over another (although he had not evaluated Mrs. Jones), and that there are more dangers in returning Debbie to her mother than in placing her in a "neutral setting," although recognizing that if Debbie remains in foster care "she is going to be further damaged." The state also offered in evidence a written evaluation

report by another psychiatrist, dated September 9, 1977, describing Debbie as a pleasant cooperative child who needed a stable home environment and wished "strongly [to] be united with her mother or if not her mother then some substitute parents."

Finally, the state offered testimony of a social worker that he had talked to adoption workers and that "the consensus is that Debbie is an adoptable girl."

A Portland doctor, a rheumatologist, who testified on behalf of Mrs. Jones based upon his examination of her hospital records, said that the lupus had involved her central nervous system, but that during periods of remission she could function normally; that if she continues with proper treatment there is some possibility that she will be able to discharge her responsibility as a parent; and that the prognosis "at the present time * * * is reasonably good," but that he could not predict the future; that it was a "good probability" that she would have an exacerbation in the foreseeable future; that she would have "ups and downs" with "a lot of exacerbations and remissions."

The doctor who treated Mrs. Jones since December 1977 testified that when in the hospital she was very sick and upset and not capable of writing a legible letter; that she had psychiatric problems, probably because of lupus, and at times "wasn't making total sense when she talked"; that although she could have made a telephone call, it would have been emotionally difficult for her to do so. That doctor also testified (in October 1979) that Mrs. Jones had then been "in remission" of from eight to ten months, during which she had been able to function competently as a mother to her son, who appeared to be a happy, well cared for child and that during that period she had also taken care of other children who appeared to be happy, well dressed and well cared for; that she loves her daughter and wants her back; that in his opinion she will continue to perform competently as a mother, and that he does not know of any psychiatric problems that would prevent her from being a good parent, although recognizing that her "main problem is the lupus and all the complications of that disease."

3. *Events since hospitalization of Mrs. Jones.*

As previously stated, Mrs. Jones was hospitalized for lupus intermittently from early May 1977 to December 1978. Meanwhile, on April 7, 1978, the state filed a petition for termination of her parental rights for failure and neglect to provide for Debbie's needs since March 30, 1977. By letter dated June 21, 1978, Mrs. Jones was informed that she "cannot have any contact with Debbie until a ruling is made regarding the termination of your parental rights * * *."

A hearing on that petition was continued until September 12, 1978, to give Mrs. Jones an opportunity to appear. When she did not appear at that time an order was entered terminating her parental rights. That order was reversed by the Court of Appeals on July 10, 1979, for the reason that the termination had been ordered as the result of a hearing in her absence. *State ex rel Juv. Dept. v. Jones,* 40 Or App 401, 595 P2d 508 (1979).

On August 29, 1979, an amended petition was filed. A hearing was held on that petition on October 5 and 11, 1979.

Meanwhile, and during the previous months of 1979, Mrs. Jones had been living with her son in a two bedroom apartment in an apartment complex after "kicking out" her husband. There she had been "babysitting" several children for working mothers who lived there. She testified that she had friends and relatives nearby in the event that she had problems with lupus; that she had not attempted to contact Debbie because she had been previously told by letter that she could not do so, and that she was in the hospital at the time of the previous termination hearing. Apparently, however, she also did not make any calls or inquiries of social workers regarding Debbie, and she was not in the hospital at that time.

Finally, depositions were offered in evidence of four mothers whose children had been taken care of by Mrs. Jones during 1979. All testified that Mrs. Jones "babysat" as many as six children; that she cared for their children very well; that the children liked her; that Michael, the son of Mrs. Jones, is happy and well cared for, and that although some of the mothers had heard of medical problems

of Mrs. Jones, they had not seen her manifest any strange or unusual behavior.

### *The Decision by the Trial Court*

After hearing this testimony, the trial judge, in an oral opinion, first found that Mrs. Jones was not a "credible witness." The trial judge then went on to find that the state had not proved its allegation of failure or neglect to provide Debbie with support for one year prior to the filing of the (amended) petition because the mother's behavior was excused during that year by the letter which told her not to contact the child. She also found that during the year prior to filing the original petition the state had failed to prove by a preponderance of the evidence "that the mother failed without reasonable and lawful cause to reunite herself with her child."

With reference to the allegation of the petition that Mrs. Jones was unfit as a parent, the trial judge found that:

"I do believe that the State has proved by a preponderance of the evidence that the mother was unfit by reason of condition and conduct which were seriously detrimental to Debbie. I cannot make a finding that the mother currently suffers from mental or emotional illness. I do not find that it has been established that she has ever suffered from mental or emotional illness. So I don't believe that one has been proved."

The trial court went on to find that:

"Putting all of that together, I think that I must then look to what's in the best interests of Deborah. And I cannot say that I am convinced that Deborah's best interests will be served by remaining in foster care. To return Deborah to her mother I realize is taking a very large chance. To keep Deborah in foster care is taking an equally large chance. This Court would have to be unconscious, ill-informed, and foolish not to know that there are very few ten-year olds who are ever adopted."[1]

---

[1] After some colloquy with counsel for the state, the trial judge also said that:

"\* \* \* I am willing to make a finding that the mother was unfit by conduct or conditions which were seriously detrimental to the child. I cannot make a finding that she is presently unfit."

that:

On October 18, 1979, the trial court entered a written order denying the state's amended petition to terminate the mother's parental rights.[2] As previously stated, the Court of Appeals affirmed by a divided court that decision by the trial court.

*The trial court and Court of Appeals did not err in denying the petition for termination of parental rights.*

The state contends in its petition for review that the decision by the Court of Appeals is "not supported by the record" and "indicates a clear trend" by that court "away from three basic tenets of the juvenile code: 1) the primacy of the children's best interests" (rather than a "focus exclusively on the rights of the parent"); "2) the necessity of meaningful *de novo* review; and 3) the guaran-

---

"* * * this is the difficulty that I have with the evidence that's been presented. Has that conduct of the mother two years ago, whether caused by mental illness or emotional illness or by lack of interest or whatever conduct by her, brought about the alienation of this relationship, and I can make a finding as to that effect. But I cannot say that the alienation of the relationship is going to make the integration impossible or improbable."

and that:

"The mother insofar as this Court is concerned has presented herself as a rather peculiar woman, but a woman who's nevertheless at this time competent to take care of children. I appreciate that this is not a satisfactory result. I'm unsatisfied with it myself, but I cannot in good conscience and fairness to this parent terminate her parental rights on the basis of the record that is before me."

[2] That order was based upon the following findings:

"The Court finds that Beverly Jones was not a credible witness.

"The Court finds that Allegation A was admitted; Allegation B (non support) was not proved; * * *

"The Court finds that Beverly Jones did not intend to abandon Debbie Swartzfager in March of 1977.

"The Court further finds that Beverly Jones' conduct in March of 1977 did cause the alienation of the parent-child relationship.

"The Court further finds that the State has failed to prove that reintegration of the child with the mother is improbable in the foreseeable future.

"The Court finds that Allegation E (unfitness) has not been proved by a preponderance of the evidence.

"The Court further finds that a termination of parental rights would not be in the best interest of Debbie Swartzfager."

tee that persons aggrieved by an order of the juvenile court will have a remedy in the appellate courts."

The state also contends that the amended petition, filed on August 29, 1979, included a new allegation that the mother was unfit as a mother under ORS 419.523(2), which was not addressed by the Court of Appeals in its opinion and that its holding that Mrs. Jones' failure or neglect to provide for Debbie was based upon her testimony, which the trial court found to be not credible, and that of her doctor's, which also was not credible.

Finally, the state contends that even if she was "lawfully excused" by her illness, that finding does not justify denial of the petition because, as stated in the Court of Appeals dissent, she will never recover her health and will always have the same excuse and that Debbie "will never have a chance"; that these comments are equally applicable to the separate allegation that her condition renders her unfit because of an incurable and possibly fatal disease; that this tragedy should not "claim two lives," including Debbie, who is already an "emotionally damaged child"; that to "sentence" Debbie to either living with her mother or in a foster home is to impose two "totally unacceptable alternatives," and that "[i]f this is the best the juvenile court system can offer Debbie * * *, then it has failed utterly."

These are strong words, and well stated. They also express a legitimate concern. In another case involving a petition for termination of parental rights under equally tragic circumstances it was said that:

"* * * the facts of this case * * * illustrate one of the serious social problems of our times. Indeed, this is a particularly tragic case and one calling for the wisdom of a twentieth century Solomon. Perhaps that ancient decree would persuade this mother to yield to the best interests of her child, regardless of constitutional considerations of 'due process.' Otherwise, the emotional and mental health of this child may well be maimed as surely as if by that proverbial sword.

"The courts, however, do not profess to possess either such wisdom or such power. * * * in deciding cases involving such problems, the courts must act within the framework and limitations of the constitution and laws of

this state and nation." Concurring opinion, *State v. McMaster,* 259 Or 291, 304, 486 P2d 567 (1971).

This is not to say that the primary consideration in the decision of such cases is not the best interests of the child. It does mean, however, that in the application of that primary test the courts can only act upon the authority and within the limitations provided by law. These limitations include not only those imposed by ORS 419.523, but also fundamental constraints imposed by the nature of our judicial system.

■    Thus, when the state files a petition to terminate the rights of a parent it undertakes the burden to prove the allegation of its petition. And when the state appeals from adverse findings by a trial judge in such a case, even though the appellate court hears such a case *de novo,* it must, as a practical matter and as in other cases subject to *de novo* review, give considerable weight to the findings by the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony.

Termination of parental rights for unfitness of a parent or for failure to provide for the needs of a child are controlled by ORS 419.523, which provides:

"\* \* \* \* \*

"(2)   The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a)   Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it *impossible to care for the child for extended periods of time.*[3]

---

[3] This statutory provision is somewhat ambiguous in that it is not entirely clear whether the term "duration" refers to the illness or the length of time that it is "impossible to care for the child."

"(b)   Conduct toward any child of an abusive, cruel or sexual nature.

"(c)   Addictive use of intoxicating liquors or controlled substances.

"(d)   Physical neglect of the child.

"(e)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(3)   The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have failed or neglected *without reasonable and lawful cause* to provide for the basic physical and psychological needs of the child for one year prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(a)   Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(b)   Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"(c)   Failure to contact or communicate with the child or with the custodian of the child. In making this determination, the court may disregard incidental visitations, communications or contributions.

"* * * * *" (Emphasis added)

### 1.   *Failure and neglect to provide for needs of child.*

We first consider the allegations by the state that Mrs. Jones failed and neglected to provide for the basic needs of Debbie for more than one year prior to the date of the original petition, filed on April 7, 1978. We agree with both the trial court and the Court of Appeals that the state failed to prove that such failure and neglect was "without reasonable and lawful cause," as provided by ORS 419.523(3).

Debbie had been placed in foster care on March 30, 1977. The state does not contend that Mrs. Jones was financially able to provide money for the support of Debbie

while in foster care, but it contends that she left Debbie when she moved to California and did not then either send for Debbie or inquire concerning her welfare, with the exception of one letter dated April 25, 1977, or respond to numerous letters from social workers.

On May 2, 1977, Mrs. Jones was hospitalized and diagnosed as being afflicted with lupus. She was then repeatedly hospitalized for lupus during both 1977 and 1978. Thus, regardless of whether the medical testimony is to be believed that her behavior during March and April 1977 was the result of lupus, which had not then been diagnosed, there was testimony to support the finding by the trial court and the holding by the Court of Appeals to the effect that during at least a substantial part of the year immediately preceding the filing of the original petition, Mrs. Jones had a "reasonable and lawful" excuse for failing and neglecting to provide for the needs of Debbie, and we agree with that finding and with that holding. Although there was evidence that she might have been able to call or make inquiries relating to Debbie during the intervals between her periods of hospitalization, and during which she may still have been suffering from lupus, we do not believe that such evidence was sufficient to require a contrary finding.

As for the year immediately prior to the filing of the amended petition for termination on August 29, 1979, it must be remembered that by letter dated June 21, 1978, Mrs. Jones had been previously informed that she could not "have any contact with Debbie until a ruling is made regarding the termination of your parental rights."[4]

On this record we agree with the holding by both the trial court and by the majority of the Court of Appeals that the parental rights of Mrs. Jones could not be properly terminated for failure or neglect to provide for the needs of

---

[4] The state cites *Swarthout v. Reeves,* 26 Or App 763, 554 P2d 617 (1976), as holding that under the adoption statute, ORS 109.324, it has been held that a similar provision does not preclude consideration of evidence of neglect prior to the beginning of the one-year period. In this case, however, there was "reasonable and lawful excuse" for the neglect by Mrs. Jones both for the one year period immediately preceding the filing of the amended petition on August 29, 1979, and also for the year immediately preceding the filing of the original petition on August 7, 1978.

Debbie because of the requirement of ORS 419.523(3) that such failure or neglect must extend for a period of "one year prior to the filing of a petition" and be "without reasonable and lawful cause."

This, of course, does not end the inquiry, because a parent who may have "reasonable and lawful cause" to fail or neglect to provide for the needs of a child may also be a parent who is "unfit by reason of conduct or condition seriously detrimental to the child" within the provisions of ORS 419.523(2).

2. *Unfitness of parent.*

The state's amended petition alleged that:

"E. The mother is unfit by reason of conduct or condition seriously detrimental to Debbie and reintegration of Debbie into the home of the mother is improbable in the foreseeable future due to conduct or condition not likely to change, to wit:

"(1) The mother suffers from *mental or emotional illness* of such duration as to render it *impossible* for her to care for Debbie *for extended periods of time.*

"(2) There has been a lack of effort on the part of the mother to adjust her circumstances to make return of the child possible.

"(3) The parent-child relationship has been alienated as a result of the conduct and condition of the mother." (Emphasis added)

The trial court, after hearing the testimony, found that Mrs. Jones was "not a credible witness," but that "Allegation E has not been proved by a preponderance of the evidence."[5] For some reason, the Court of Appeals did not discuss in its opinion the contention by the state that Mrs. Jones was "unfit."

With reference to subparagraph (1), there was a conflict in the testimony whether lupus is physical illness, rather than a "mental or emotional illness," as alleged and as provided by ORS 419.523(2)(a). We shall assume, however, that lupus is a "mental or emotional illness" for purposes of that statute. There was also a conflict in the testimony whether, despite the then-existing "remission"

---

[5] The fact that Mrs. Jones was found by the trial court to be "not a credible witness" would not, of itself, provide grounds for the termination of her parental rights. *Cf. Cutts v. Cutts,* 229 Or 33, 43, 366 P2d 179 (1961).

from that illness, the probabilities were that she would not only have future "exacerbations" of the disease, but that such exacerbations would be of such a nature and duration to render Mrs. Jones "unfit" as a parent for Debbie.

■ The testimony was uncontradicted, however, that during the period of from eight to ten months in 1979 immediately prior to the trial of the case, Mrs. Jones had been able to function normally as a mother for her son, who appeared to be happy and well cared for, and had also functioned capably as a "babysitter" for children of working mothers in the apartment complex where she lived. In view of that testimony, we agree with the trial judge that the state had not proved by a preponderance of the evidence that Mrs. Jones suffered from an illness of such a nature or duration "as to render it *impossible* to care for Debbie for *extended periods of time.*" [6]

With reference to subparagraph (2), we also agree with the finding by the trial court in view of the uncontradicted testimony that during that period of from eight to ten months Mrs. Jones had been living with her son in a two bedroom apartment, with the result that the state had not proved its allegation that she had not "adjusted her circumstances to make the return of the child possible."

With respect to subparagraph (3), alleging that the "parent-child relationship has been alienated as a result of the conduct and condition of the mother," the evidence was also somewhat conflicting, at least with reference to the extent of the alienation. We note, however, that the alienation of parent-child relationship is not included in ORS 419.523(2) as one of the specifications provided by that statute as a ground for termination of parental rights.

■ It is true that ORS 419.523(2) provides that the court "shall consider but is not limited to" the grounds specified in subsections (a), (b) and (c) and (2) of that

---

[6] This is consistent with our holding in *State ex rel Juvenile Dept. v. Martin*, 271 Or 603, 608, 533 P2d 780 (1975), in which it was held, although under different facts, that the parental rights of a defendant suffering from schizophrenia would not be terminated in view of testimony that during periods of remission he was a good parent and there was "at least a possibility" that with proper treatment he would be able to properly discharge his responsibilities as a parent in the future.

statute. It may or may not be that the alienation of relations between a parent and child may be of such a nature and degree as to justify the state in terminating the parental rights of the mother or father of a child for that reason alone.[7] We believe, however, that the courts should be hesitant in terminating parental rights for what is commonly referred to as "alienation" of relations between parents and their children, regardless of whether the conduct of the parents was primarily responsible for such alienation. It is common knowledge that in this day and age there is at least some degree of "alienation" in the relationships between parents and their children in many American families and that conduct by parents is sometimes the cause of such alienation. Surely the Oregon legislature did not intend for the courts to terminate parental rights in all such families and either place the children in foster homes or put them up for adoption.

We also note that in this case, aside from the testimony of the mother expressing her love for Debbie and her desire for Debbie's return, and also aside from the testimony that Debbie was hurt deeply as the result of being left in Portland by her mother and is considered by a psychiatrist to be a "damaged child," Debbie told another psychiatrist that she wanted to return to her mother and appeared to express affection for her.

On this record we agree with the finding by the trial judge to the effect that the state had failed to prove that the alienation of relations between Debbie and her mother was of such a nature or degree as to require the termination of the parental rights of Mrs. Jones.

In so holding, we also agree with the observation by the trial judge at the conclusion of the trial that to return Debbie to her mother "is not a satisfactory result," despite the finding that Mrs. Jones is "at this time competent to take care of children." As also noted by the trial court, however, keeping Debbie in a foster home in the hope that she may be adopted, which may be difficult for a ten-year-old child, is also not a satisfactory solution.

---

[7] In *State ex rel Juvenile Dept. v. Wagner,* 21 Or App 396, 535 P2d 102 (1975), cited by the state, it appears (at 402) that "alienation from the mother" was but one of the reasons for the termination of her parental rights.

We are concerned, as is the state, that in living with her mother Debbie may "never have a chance." In *State v. McMaster, supra,* although involving different facts, much the same contention was made that the primary test to be applied in such cases is the best interests of the child and that parental rights should be terminated when the circumstances are such that a child may "never have a chance." In that case this court, after again recognizing (at 303) that "the best interests of the child are paramount," went on to say that:

"The witness was undoubtedly correct when he stated that living in the McMasters' household would not 'allow this child to maximize her potential.' However, we do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do."

For these reasons the decisions by both the trial court and the Court of Appeals are affirmed.