Argued and submitted April 2, reversed May 21, 1985

In the Matter of Sara Lynn Habas, a Child.

## STATE ex rel JUVENILE DEPARTMENT OF MULTNOMAH COUNTY,
*Respondent on Review,*

*v.*

## HABAS,
*Petitioner on Review.*

(CC 80,690; CA A30611; SC S31491)

700 P2d 225

Clint A. Lonergan, Portland, argued the cause for petitioner on review. With him on the petition were Howard R. Lonergan and Richard L. Lonergan, Portland.

Linda DeVries, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the response

to the petition were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Virginia L. Linder, Assistant Solicitor General, Salem.

JONES, J.

**JONES, J.**

This is a proceeding for termination of parental rights based upon a petition which alleged:

"2. The child is within the jurisdiction of the Court by reason of the following facts:

On December 17, 1982, Sara Lynn Habas was made a ward of the Court based upon findings that her conditions and circumstances were such as to endanger her welfare.

"3. A. Carol Habas, mother of the above-named child, is unfit by reason of conduct and condition seriously detrimental to the child and reintegration of the child into the home of the mother is improbable in the foreseeable future, due to the conduct and conditions not likely to change, to-wit:

1. The mother suffers from mental illness of such nature, duration, and intensity as to render her incapable of providing adequate care to a child.

2. The mother has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that it appears reasonable no lasting adjustment can be affected *[sic]*.

Wherefore, the State seeks the termination of her rights as a parent."

On December 19, 1983, a termination of parental rights hearing was conducted in the Circuit Court of Multnomah County pursuant to ORS 419.523 and 419.525, which provided in relevant part:

ORS 419.523:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court * * * may be terminated as provided in this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that *the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is*

*improbable in the foreseeable future due to conduct or conditions not likely to change.* In determining such conduct and conditions, the court shall consider but is not limited to the following:

    (a)   Emotional illness, *mental illness* or mental deficiency *of the parent of such duration as to render it impossible to care for the child for extended periods of time.*

    * * * * *

    (e)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or *failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."* (Emphasis added.)

ORS 419.525(2):

"A hearing shall be held by the court on the question of terminating the rights of the parent or parents. No such hearing shall be held any earlier than 10 days after service or final publication of the summons. The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by a preponderance of competent evidence and a stenographic or other report authorized by ORS 8.340 shall be taken of the hearing."

After taking both lay and expert testimony, the juvenile court judge conducting the hearing found the state proved the allegations in the petition by clear and convincing[1] evidence. She then permanently committed the child to the Children's Services Division (CSD) for adoptive placement and terminated the parental rights of Carol Habas. The defendant-mother appealed that judgment. The father's rights were terminated previously. The Court of Appeals affirmed without opinion.

We allowed the mother's petition for review because of our concern that (1) the allegations in the complaint were inadequate, (2) the findings by the court were not sufficient to justify termination, and (3) CSD failed to make reasonable

---

[1] While ORS 419.525(2) holds the state to a "preponderance" standard, the due process clause of the Fourteenth Amendment requires the "clear and convincing" standard applied here. *Santosky v. Kramer,* 455 US 745, 102 S Ct 1388, 71 L Ed 2d 599 (1982); *State ex rel Juv. Dept. v. Farrell,* 292 Or 822, 642 P2d 1167 (1982).

efforts to provide support services to the mother as required by ORS 419.523(2)(e). We reverse on all three grounds.

This case once again demonstrates one of the most difficult decisions a juvenile court judge is called upon to make. The facts are tragic, probably as tragic as those faced by this court in *State v. McMaster,* 259 Or 291, 304, 486 P2d 567 (1971), in which Justice Tongue stated in a concurring opinion:

> "* * * [T]he facts of this case * * * illustrate one of the serious social problems of our times. Indeed, this is a particularly tragic case and one calling for the wisdom of a twentieth century Solomon. Perhaps that ancient decree would persuade this mother to yield to the best interests of her child, regardless of constitutional considerations of 'due process.' Otherwise, the emotional and mental health of this child may well be maimed as surely as if by that proverbial sword."[2]

We briefly capsulize the relevant facts from our review of the record: The child's 31-year-old mother suffers from periodic bouts of manic-depressive psychosis requiring

---

[2] That ancient decree is found in The Bible, 1 Kings 3:16-28 (King James)(c. 650 B.C.):

> "Then came there two women, that were harlots, unto the king, and stood before him. And the one woman said, 'O my lord, I and this woman dwell in one house; and I was delivered of a child with her in the house. And it came to pass the third day after that I was delivered, that this woman was delivered also: and we were together; there was no stranger with us in the house, save we two in the house. And this woman's child died in the night; because she overlaid it. And she arose at midnight, and took my son from beside me, while thine handmaid slept, and laid it in her bosom, and laid her dead child in my bosom. And when I rose in the morning to give my child suck, behold, it was dead; but when I had considered it in the morning, behold, it was not my son, which I did bear.' And the other woman said, 'Nay; but the living is my son, and the dead is thy son.' And this said, 'No; but the dead is thy son, and living is my son.' Thus they spoke before the king. Then said the king, 'The one saith, "This is my son that liveth, and thy son is the dead": and other saith, "Nay; but thy son is the dead, and my son is the living," ' And the king said, 'Bring me a sword.' And they brought a sword before the king. And the king said, 'Divide the living child in two, and give half to the one, and half to the other.' Then spoke the woman whose the living child was unto the king, for her bowels yearned upon her son, and she said, 'O my lord, give her the living child, and in no wise slay it.' But the other said, 'Let it be neither mine nor thine; but divide it.' Then the king answered and said, 'Give her the living child, and in no wise slay it; she is the mother thereof.' And all Israel heard of the judgment which the king had judged; and they feared the king: for they saw that the wisdom of God was in him, to do judgment."

medication and hospitalization. An honors high school graduate, and usually gainfully employed,[3] the mother first developed symptoms as an adult and has been hospitalized five times: an eight-month stay at Dammasch Hospital, followed by lithium therapy; a two-week stay in Colorado following temporary inability to digest lithium; a one-month stay in Philadelphia; a two- or three-month stay back at Dammasch, apparently caused by giving up lithium during her pregnancy on the advice of her physician; and a several-week stay after her daughter was taken in these proceedings.

On September 10, 1982, during the mother's penultimate stay in the hospital, the child who is the subject of this action was born. After the birth, the child was declared a ward of the court and placed in the custody of CSD. Upon release, the mother began to work with CSD to achieve a stable situation and regain custody. Two parent-child service workers testified that the mother loved the child, was sincere about the parenting classes, that there was bonding between the mother and child and that toward the end of the program the child would cry when the mother left the room. They recommended that the child be returned to the mother, contingent on receiving the support services of a homemaker and visiting nurse immediately.

The child was returned to the mother's custody on June 6, 1983. At that time, CSD had offered, and the mother had agreed to accept, ongoing in-home counseling, training and mental health monitoring. After the child had been home for 16 days,[4] and before any state social agency had contacted the mother to provide the contemplated services, the mother suffered a deterioration of her mental health which culminated, for the purposes of this proceeding, when the infant was

---

[3] The record reveals that the mother enrolled at the Denver Institute of Technology and studied auto mechanics for nine months. She then obtained a job with the City of Thornton, Colorado, fixing and maintaining city cars. She lived in her own apartment and enjoyed bowling as an outside activity. She was an auto mechanic for six months until the CETA funding ran out. She then obtained a job with the City of Thornton as a custodian and held that position for one year, until she went to work for the police department. At the police department she typed reports that were called in by on-duty officers. After being the only person out of nine to pass a civil service test, she went to work for the detective division and was in charge of the burglary and mug shot files.

[4] The trial court judge found the child had been home six days, but the record indicates 16.

left unattended for several hours while the mother wandered around Portland in a disoriented state. The child was found alone, suffering from severe diaper rash but otherwise healthy. Eight days later the state petitioned to terminate the mother's parental rights based on her mental illness and her failure to effect a lasting adjustment after reasonable efforts by available social agencies.

The defendant-mother and the state agree that when she is not in the midst of a manic-depressive episode, she is a fine parent, and that when she is in the midst of an episode, she is unfit. The dispute centers on the intensity and duration or her illness, and on the state's obligation to refrain from termination until therapeutic social services have proven ineffective. Although we review this case anew upon the record, "as a practical matter [we] * * * give considerable weight to the findings by the trial judge who had the opportunity to observe the witnesses." *State ex rel Juv. Dept. v. Jones,* 290 Or 799, 810, 626 P2d 882 (1981).

The judge offered this explanation for her conclusion that the mother's illness rendered the mother unfit:

> "I think that the State has proved [its allegations] by clear and convincing evidence.
>
> "I am aware that there was a failure of the State to provide the mother with some of the support services immediately when the child was returned and I don't find from the testimony or from the duration of that lack of support that it was extreme carelessness. Apparently, there was some I would say breakdown in communication.
>
> "The thing that concerns me and the thing that makes me rule the way I rule is that the mother's testimony is that during this episode she was on her medication and that even though she was having some hallucinatory thoughts, she nevertheless didn't seek help. Apparently, she went from a stable healthy person June 6th to a person who six days later was unable to provide care for herself. I think that even though the State for that six-day period was not offering any services, she nevertheless had had practically all of the services that were available to her and she also had hopefully the wherewithal to obtain services that she needed. The problem is that she did not have the insight or ability to recognize that she needed services.

"* * * I don't think that I can rely on the State of Oregon under the conditions of this woman's illness to be able to provide all of the services that she needs because I think she needs someone to be with her, someone who is devoted to her would not permit her to abuse and neglect herself. I am very concerned if she were to have an infant with her that she would not intentionally harm that infant, but that she might nevertheless harm the infant because of her own inability to take care of herself and the baby."

The judge concluded, in other words, that the seriousness of the illness was such that even with medication and reasonable social services the mother was still unfit.

We note that ORS 419.523(2) states (as one of the conditions a trial could shall consider) that the mental illness must be of such duration "as to render it impossible to care for the child for extended periods of time." Yet the state alleged that the mental illness was of such a nature, duration and intensity as to render the mother incapable of providing adequate care to the child. Thus, the state's allegation did not follow the statute.

We previously noted that the language of ORS 419.523(2) provides the proper test to apply in cases of mental illness, recognizing that mental illness is only one of the factors that may be considered in a termination proceeding. *See generally State ex rel Juv. Dept. v. Jones, supra.* In *Jones,* we found that although the parent suffered from a "mental or emotional illness," that illness was subject to exacerbations and remissions, much like the mother's illness in this case. Because of the extensive periods of remission, we held that the state had not proved that the parent's illness was of such a nature or duration "as to render it *impossible* to care for [her child] for *extended periods of time.* " 290 Or at 814 (emphasis in original). This ruling was consistent with our holding in *State ex rel Juvenile Dept. v. Martin,* 271 Or 603, 608, 533 P2d 780 (1975), which held, under different facts, that the parental rights of a defendant suffering from schizophrenia would not be terminated in view of testimony that during periods of remission he was a good parent and there was "at least a possibility" that with proper treatment he would be able to properly discharge his responsibilities as a parent in the future.

In *State v. Blum,* 1 Or App 409, 463 P2d 367 (1970), the Court of Appeals affirmed the termination of parental rights where the parent's condition was determined to be seriously detrimental to the child. The uncontradicted evidence in that case was that the mother had a recurring mental illness, that the mental illness was accompanied by incapability seriously detrimental to the child, and that the prognosis was that she never would be able to care for her child.

■ ■ The trial judge in this case, although expressing compassion and concern for parent and child, made no specific findings in terms of the statute. Instead, she stated that the allegations of the petition had been proven. The problem with basing the findings on the allegations in the petition, as we have pointed out, is that the petition does not follow the statute. This procedure resulted in a failure of proof. In *State v. McMaster, supra,* over strong dissent, we stated that ORS 419.523(2) passes state and federal constitutional muster on the issue of "vagueness" and that the statutory provisions are specific enough for the ordinary parent to "get the message." However, we believe the wording of the mental illness portion of the statute should be pled and proved as written because the legislature specifically addressed the subject of mental illness as a ground for termination.[5]

■ ■ The statutory language refers to a mental illness "of such duration" as to render it impossible to care for the child for extended periods of time. This statutory provision is somewhat ambiguous in that it is not entirely clear whether the term "duration" refers to the illness or the length of time

---

[5] There is a division of opinion on the question of whether mental illness should even be a ground for termination of parental rights. As Judge Langrty noted in *State v. Blum,* 1 Or App 409, 418 n 4, 463 P2d 367 (1970):

" 'Opinion is divided on whether mental incapacity should be a ground for termination. One viewpoint is that * * * a mental condition considered incurable today may be amenable to treatment tomorrow; therefore, mental incapacity should not be a ground for termination. The opposite view is that there are situations in which substantial evidence can be produced of severe mental illness * * * of a permanent nature * * * [w]here the natural tie should be severed to permit the child to have meaningful parental relationships through adoption.' "

Quoting from a 1961 publication of the Children's Bureau, Social Security Administration of the United States Department of Health, Education and Welfare, entitled *Legislative Guides for the Termination of Parental Rights and Responsibilities and the Adoption of Children* (Pub. No. 394-1961).

that it is "impossible to care for the child." *State ex rel Juv. Dept. v. Jones, supra,* 290 Or at 810 n 3. We believe the language refers to the duration of the illness. Here no finding was made that the duration of the illness had existed for any specific length of time, or that it would probably continue into the future.

■      The juvenile court judge also made no specific finding that the mental illness made it impossible for the parent to care for the child in the future. Further, there was no allegation or finding as to the amount of time the parent would be incapacitated from caring for the child due to mental illness. Although we believe that the term "impossible" must not be taken literally because there is always the possibility of some "miracle" cure for certain types of mental illness, we do believe the statute requires that the judge must find, based upon evidence from a qualified psychotherapist, that the mental illness is probably permanent and that the condition will probably render the parent incapable of caring for the child for extended periods of time.

In sum, the allegations of the petition and the findings based on those allegations were insufficient to justify termination under ORS 419.523.

■■      Because this case may surface again, we observe that this mother was never given the opportunity to "effect a lasting adjustment after reasonable efforts by available social agencies." The fact of the matter is that although the mother took classes in parenting before regaining custody, the child literally was dumped into the mother's lap with no supervision or guidance as required by ORS 419.523(2)(e). The lack of support services appears to have been caused by some administrative confusion regarding which of two counties was to provide the services. Although we recognize that the legislature considers the interests of the child to be paramount,[6] nevertheless the legislature also recognizes that parental termination is the last resort after all other interventions of

---

[6] The committee which prepared the text that was codified in ORS 419.523 *et seq.* said to the legislature:

"* * * [P]resent law represents altogether too great an emphasis on the rights of the parent and too little emphasis on * * * *the interests of the child* * * *." Report of the Legislative Interim Committee on Judicial Administration, Part II Juvenile Law 22-23 (1959) (emphasis supplied).

social services have failed. Under the circumstances of this case, reasonable efforts to provide social services should have been attempted before ordering termination.

We are fully aware of the timing difficulties an appeal of this nature presents. Eighteen months have elapsed since the child was taken from the mother and placed in foster care. Apparently many authorities in juvenile care feel that once a child is in foster care longer than six months, the chances of the child returning home diminish considerable. *See, e.g.,* Gruber, Foster Home Care in Massachusetts: A Study of Foster Children, Their Biological and Foster Parents (1973); Sherman, Neuman and Shyne, Children Adrift in Foster Care: A Study of Alternative Approaches 1-9 (1974); Rein, Nutt and Weiss, *Foster Family Care: Myth and Reality,* in Schorr, Children and Decent People 24, 37-39 (1974); Fanshel, *Status Changes of Children in Foster Case: Final Results of the Columbia University Longitudinal Study,* 55 Child Welfare 143 (1976); Maas, *Children in Long-Term Foster Care,* 48 Child Welfare 321 (1969). We further acknowledge that the Juvenile Justice Standards Project of the Institute of Judicial Administration and the American Bar Association recommend that,

> "* * * in general, a child either should be returned home or freed for adoption or other permanent placement within a year of the time [the child] enters foster care. The preferred disposition is to return a child to [the] natural parents. * * * However, in a number of cases, perhaps even the majority of cases, if children are removed only as a last resort, return will not be possible. In such cases termination of parental rights may be essential in order to provide the child with a permanent home." IJA-ABA Juvenile Justice Standards Project, Standards Relating to Abuse and Neglect 149 (Tent draft 1977).

Of course, if we refuse to return a child to the natural parents merely because of the passage of time, even where parental rights were violated in connection with the termination, an appeal rarely would be an effective alternative. In this special case, the mother, through no fault of her own, did not have a fair opportunity to care for the child with the aid of services that were available and which should have been provided. Foster care may be generally unsuitable for long-

range placement, but in a case of occasional temporary disability such care may provide the proper resource for this child and this mother.

The Court of Appeals is reversed and the order terminating parental rights is set aside.