Argued and submitted May 29; resubmitted In Banc November 13, 1997, affirmed February 25, petition for review denied June 23, 1998 (327 Or 305)

In the Matter of
Rose Marie Frazier, a Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN & FAMILIES,
*Respondent,*

*v.*

Gary FRAZIER
and Glenda Kolacki,
*Appellants.*

(95-040; CA A95571 (Control))

In the Matter of
Faith Ann Sparks, a Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN & FAMILIES,
*Respondent,*

*v.*

Gary FRAZIER
and Glenda Kolacki,
*Appellants.*

(96-294; CA A95582)
(Cases Consolidated)

955 P2d 272

George W. Kelly argued the cause and filed the brief for appellant Gary Frazier.

Terrance P. Gough argued the cause and filed the brief for appellant Glenda Kolacki.

Erika L. Hadlock, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

DEITS, C. J.

Edmonds, J., dissenting.

**DEITS, C. J.**

Mother and father appeal from a judgment terminating their parental rights to their two daughters. ORS 419B.500 (1995). On *de novo* review, ORS 419A.200(5), we affirm.

■ To terminate parental rights, the evidence in favor of termination must be clear and convincing. ORS 419B.521 (1995). In determining whether the state has met its burden of proof for termination under ORS 419B.504, (1995)[1] the court must consider all of the factors listed in that statute and any other relevant considerations. *See State ex rel CSD v. Payne*, 323 Or 1, 4, 912 P2d 904 (1996) (Graber, J., dissenting) ("ORS 419B.504 allows the trial court to consider any kind of 'conduct or condition detrimental to the child,' when 'integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change.' "); *see also State ex rel Juv. Dept. v. Boren*, 105 Or App 599, 607-08, 806 P2d 149 (1991) (consider totality of circumstances).[2] We give "considerable

---

[1] ORS 419B.504 (1995) provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

[2] The dissent states that, in its view, the state must prove at least one of the factors in ORS 419B.504 (1995) or ORS 419B.506 (1995) in order to terminate parental rights. Because we conclude that the state has proven more than one of the factors in ORS 419B.504 (1995) as to each parent, we do not decide whether the

weight" to the trial court's findings on issues of credibility, due to the court's ability to see and hear the witnesses. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990). However, because our review is *de novo*, we must independently assess and evaluate the evidence. *Boren*, 105 Or App at 601.

■ Here, the trial court concluded that the state had met its burden to terminate the parental rights of both mother and father based on emotional illness, mental illness or mental deficiency of such a nature and duration as to render them incapable of providing proper care for these children for extended periods of time. The court also concluded that due to the parents' lack of effort to adjust their circumstances, conduct, or conditions to make the return of the children possible and their failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected under ORS 419B.504 (1) and (5). The trial court explained its conclusions:

> "[Father] has threatened to kill [mother] on multiple occasions, at least once holding a firearm to her head while she held the child, Rose Marie Frazier. The suggestion that [mother] made these allegations up to get shelter at Womenspace is simply not credible in view of her numerous open disclosures at other times, including two sworn abuse petitions. Moreover, despite his consistent unsworn denials of abuse, [father] did not testify in the trial of these cases. Accordingly, he did not deny the allegations under oath, nor did he subject himself to the rigors of cross examination.
>
> "I also find Dr. Ewell's assessment of [father]'s mental state and outlook persuasive. [Father] is not a viable resource to raise either of these children. The evidentiary record abundantly supports this [finding]. Limited examples include [father]'s electrification of the living room couch, setting roof traps for prowlers, and his unhealthy, threatening relationship towards [mother]. The totality of the evidence supports both a disturbing and pessimistic assessment. The petitioner offered [father] the intensive

clear and convincing standard applies ind⸱⸱endently to each individual factor or may be met by considering the totality of all ⸱f the circumstances even when no one specific enumerated factor is proven to a cl⸱ ⸱r and convincing standard.

psychotherapy services discussed by Dr. Ewell. [Father] rejected those services.

"* * * * *

"[Mother]'s circumstances were also credibly assessed by Dr. Ewell. Her parenting skills are weak, her intellect is limited, and she suffers from a personality disorder stemming from an unfortunate combination of causes which impair her chances to ever successfully parent children.

"[Mother] has accepted homemaker and parenting training, but has rejected sexual abuse counseling, and does not comprehend her need to seek the long-term intensive treatment recommended by Dr. Ewell. The most troubling aspect of this case lies in SCF's failure to offer [mother] the intensive, individualized psychotherapy discussed in Dr. Ewell's report after it was received by the agency in April 1995.

"* * * * *

"A significant variety of services were offered to [mother]. She even sought some services on her own. However, she refused one of the most critical services required in her case: sexual abuse treatment. Dr. Ewell's report makes clear that her prognosis for change is poor. [Mother] does not comprehend her need for intensive treatment.

" 'Under the most optimistic scenario, [mother] will probably require a year to two years intensive intervention, followed by long-term monitoring and supervision. * * *.'

"Significantly, when the agency decided to petition for termination, it met with both parents in June 1995. [Father] was adamant that he wished to parent Rose. The agency made it clear that ongoing services would be provided if desired. On the other hand, [mother] was acquiescent, and offered to turn Rose over to [father]. Her wholly inappropriate reaction was not only consistent with Dr. Ewell's assessment, but also highlights the bleak outlook for services to a parent *who alternatively alleges, then denies violent abuse, and asserts then withdraws interest in parenting. * * *

"There was no evidence that [mother] (who did not testify in trial) ever showed interest in therapy, even after she was represented by counsel in these proceedings. Moreover,

her absconding with Faith Sparks from May to August 1996, portends ominously. The fact that Faith was found with her mother in the company of a man who [mother] alleges sexually abused her as a minor shows a strong resistance to change which yields to pessimism." (References to the record omitted; emphasis supplied.)

We will first address father's argument that the trial court erred in terminating his parental rights. The petition for termination alleged that father's parental rights as to Rose[3] should be terminated on the following grounds:

"[F]ather is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable in the foreseeable future due to conduct or conditions not likely to change, including, but not limited to the following:

"(a) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(b) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the father incapable of providing care for extended periods of time.

"(c) Mental, emotional, or psychological abuse of the child.

"(d) Physical and emotional neglect of the child.

"(e) Lack of effort to adjust the father's circumstances, conduct or conditions to make return of the child to the father possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

We agree with the trial court that the state proved by clear and convincing evidence that father is unfit on the ground that he suffers from mental deficiencies that render him incapable of providing proper care for the children and that due to lack of effort to adjust his circumstances, conduct,

---

[3] The petition for termination of father's parental rights as to Faith is identical except that it alleges "[m]ental, emotional, or psychological abuse of the child's sibling" in paragraph (c) and it excludes paragraph (d).

or conditions to make the return of the children possible and his failure to effect a lasting adjustment after reasonable efforts by available social agencies that no lasting adjustment can be made. ORS 419B.504(1) and (5).

The evidence supporting our conclusion is as follows. At the time of trial, September 1996, mother was 21 and father was 51 years old. They are not married, but they began living together when mother was 18. Mother was sexually abused throughout her childhood by her mother's boyfriends. Father told a caseworker that he befriended mother and took her in to get her away from sexual abuse perpetrated by her mother's current boyfriend. Mother and father's first child, Rose, was born in April 1994. She was taken from them in January 1995. Faith was born in May 1996. The state immediately petitioned for termination of mother's parental rights as to Faith and obtained a warrant to seize her from mother. The state located and removed Faith from mother about three weeks before trial. Sometime during the period that father and mother lived together, father suffered a stroke. Mother and father separated for a period of time after Rose was removed. As of the time of the trial, they were once again living together.

Ewell, a psychologist who examined father and mother in April 1995, concluded that father suffers from a delusional disorder. He stated that people with a delusional disorder, who have persecutory delusions, sometimes act on those delusions, "thinking other people are out to harm them, even their spouses, and react physically or in a violent way [toward] them." Ewell said that a delusional disorder was likely to remain with some degree of permanency or rigidity. His prognosis was that father needed "long-term, intensive psychotherapy" before he could become a viable resource for his daughter. He doubted that anger management training alone would be sufficient to "have the necessary impact." In his report, he concluded that

> "[g]iven [father's] almost complete denial at this point, the prognosis for successful intervention is poor. In fact, I do not believe that services could be expected to produce the results of [father] becoming a safe, parental resource within any time-frame which would meet the needs of his almost

one year old child. Without intensive intervention, his condition is not likely to spontaneously improve."

Dr. Grosscup, a psychologist who examined father in July 1995, testified that he suffered from a major depression disorder and a schizophrenic disorder, which she defined as the "umbrella for the delusional thinking." She initially concluded that father's mental condition was related to his neurological problems that she thought were related to his stroke. However, after considering the evidence that father had significant mental problems that predated his stroke, she said that such evidence would rule out the stroke as a factor and would change her diagnosis to delusional persecutory. Further, Grosscup stated that *even if* father's problems were neurologically based, she would not change her prognosis, which was "[e]xtremely poor." She testified that her tests showed a "strong streak of paranoid ideation" that would make it very difficult for father to cooperate with therapy. Although Grosscup stated that she was "in the gray area" as to whether father's parental rights should be terminated, she also said that the best case scenario was that father could eventually evolve into unsupervised *visitation with monitoring*. Grosscup never indicated that she believed that father would ever be able to regain full custody without state monitoring.

There is considerable evidence in this record about father's conduct that is consistent with the experts' assessment of him. All of the state's witnesses testified that father was obsessively concerned with prowlers on his property. At one point, father shot a bullet into the garage when he thought that he heard prowlers. To deter the prowlers, he hung fish hooks on the roof, greased gutter drainpipes, pounded nails into the top of fence slats then broke the heads off and placed boards around the yard into which he had hammered nails that were facing up. He sometimes stayed up all night in an attempt to catch prowlers. Prowlers were father's primary topic of conversation with the social workers who came to the parents' home. He also accused a caseworker of bugging his phone.

In mid-July, mother told Nancy Bischofs-Reeves, a homecare provider who had been providing services to the

family, that father went into a rage because he had run out of drugs. She said that in his rage he broke glass and dumped cereal on the floor. Several weeks later, mother told Bischofs-Reeves that father had tried to strangle her and had put a gun to her head while she had Rose in her arms. Mother filed for a restraining order in which she related that, in addition to holding a gun to her head, father had earlier threatened her and that she feared for her life. On January 11, 1995, mother reported to a County Health Department worker that father had gotten angry and choked her, put a handgun to her throat and threatened to kill her if she left with Rose. On January 24, mother called Bischofs-Reeves and told her that father had again held a gun to her head, this time while the baby was present. At that time, the State Office of Service to Children and Families (SOSCF)[4] personnel, with the assistance of police, removed Rose from the home and placed her in foster care. The police searched father and found a loaded handgun in his pocket, which he claimed to have forgotten placing there. On February 1, 1995, mother got a second restraining order against father. Ewell reported that mother told him that her relationship with father was "emotionally and physically volatile" and that she had told him that, on four different occasions, father had held a gun to her head and threatened to kill her. She said that although father never hit her, they threw things at each other, that they "wrestle[d]" on occasion and that she had knocked his front teeth out during one incident.

Father attempts to minimize the effect his behavior may have had on Rose by stating that the child was not, in fact, physically harmed when the parents fought. The dissent concurs with father stating th t, although father's conduct with respect to mother "could .1ave put Rose in danger of harm, it *was not directed at [the child]*." 152 Or App at 617 (emphasis supplied). However, the fact that father's violence may have been aimed at mother, not Rose, is of little relevance if the violence could potentially also harm the child.

The record shows, unquestioningly, that at least some of father's violent behavior put Rose at serious risk of harm. Mother told several people of an incident in which she

---

[1] Formerly Children's Services Division (CSD).

was holding Rose when father assaulted her. On a later visit to the house, just four days before SOSCF removed Rose from the home, SOSCF caseworker Marshall was visiting the parents. She witnessed an interaction between the parents that she said scared her. She testified that when father found out that someone had reported the January 11 gun incident to SOSCF, he became angry and "glared" at mother.

> "He asked her, 'Did you say that?' And that was regarding a gun incident, again, that had been reported.

> "She said, 'No' and moved away. She actually moved away from where she was sitting and placed herself on the floor beside Rose. And just so—and Rose was then between the two of them. She *actually moved so Rose was in front of her*, and she cringed and bowed her head."

Father continued on with this raging confrontation for several more minutes. The SOSCF caseworker testified that she was "very fearful" because father was so angry and that she actually got up to check on father's whereabouts after he left because she was "concerned about what he was going to do next."

■ Although father did not become physically violent in the confrontation, the above incident shows that father did not stop his angry confrontation with mother even though mother exhibited signs of fear and even though the child was in their presence. Father's violence towards mother and mother's reaction to that violence—placing Rose between father and herself—put Rose in serious danger. Further, the intake person at Womenspace testified that Rose was "nonresponsive" when mother came to the shelter following one of father's violent outbursts and stated that such a reaction is not uncommon for children who have witnessed domestic violence. Evidence that father will not curtail his violent behavior, even if one of the children is positioned between him and the target of his anger, supports our view that father is a danger to the children.

■ Father suggests that his mental condition, including his paranoia about prowlers and his violent behavior, is somehow related to his stroke, and that the court should wait to see if a medical procedure done to clear a major artery has changed his mental condition. The dissent apparently

agrees, relying on the fact that Ewell's evaluation of father occurred before he was treated for his strokes and that Ewell testified that father's delusional disorder may have a neurological origin. However, there is clear and convincing evidence in this record that indicates that father's mental problems and behavior are not related to his strokes. As discussed above, the evidence shows that father's mental problems existed long before he had his strokes. All three of father's adult daughters testified that their father engaged in delusional and violent behavior throughout their childhood. They said that he was violent towards their mother while she was his wife. The physical violence included *pointing a gun at his wife, threatening to kill her*, ripping her earrings out of her ears, ramming her head through a wall, pushing her out of a moving car, burning her with a cigarette and forcing her to have sex with other men.[5] Father's violent behavior continued into his children's adulthood, including an incident where father attacked one daughter with a fork and ended up hitting a second daughter as she tried to intervene. After being removed from the house by one of the daughter's husband, father stood outside ranting at the daughter, calling her names and saying, "Get out here. I'm going to kick your ass." One daughter testified that she had seen father throwing stones at one of his girlfriends after father had left their mother. The daughter said that all of father's relationships with women with whom he was intimate involved violence.

Father's propensity toward violence did not end, as the dissent states, immediately following father's divorce from his wife and begin anew just after his strokes. The evidence is unrefuted that father had paranoid thoughts that resulted in violent behavior long before he had any strokes. Further, although there may have been periods when he did not engage in violent behavior, the evidence shows that his

---

[5] The emphasized portions are identical to the kind of behavior mother accused father of committing against her. There was also testimony from a care provider that Rose had a burn mark on her that was consistent with an ash from a cigarette and that mother had told her that father had dropped the ash on the baby while he was holding her, and that this was the third time that the baby had been burned by father's ash. There is no evidence that the burns on the baby were intentional, however.

violent conduct toward mother is similar to the kinds of violence that he perpetrated against other women with whom he had intimate relationships.

■ The fact that there have been no further reports of domestic abuse since Rose's removal also is not significant because, although mother and father were living together at the time of trial, they lived apart most of the time after Rose was removed from their home. Further, there is evidence that suggests that father's tendencies toward violence against others have not diminished since the surgery, including SOSCF caseworkers' testimony that they were concerned about their safety when dealing with father during the pendency of the termination proceedings. One caseworker stated that father became "enraged" at SOSCF personnel numerous times after the children were removed and another testified that father had threatened him and his child.

The dissent asserts that "it is uncontroverted that father underwent medical treatment for a health condition that apparently was related to his problems with anger after Rose was removed." 152 Or App 617-18. However, the dissent ignores the fact that *no* witness testified that there was a definite, or even a likely, correlation between father' abusive conduct and his medical condition or that there was an expectation that the treatment for the medical condition would cure his violent tendencies. Neither father's regular doctor, nor the doctor who operated on father, testified that father's violent tendencies were related to his stroke. Father's regular doctor, Hill, testified that father had emotional symptoms that could be related to the stroke, such as depression and frustration. However, he also said that the problems for which he was treating father did not include treatment for mental illness.

Father's surgeon, DuPriest, testified that father had the following symptoms of stroke when he examined him in the spring of 1995: a "moderate amount of difficulty expressing himself" and "mild weakness of his hand." When asked whether father appeared to be frustrated with his communication difficulties, DuPriest replied yes and said that "[t]hat is quite typical when people have trouble talking." He stated that it was not uncommon for people to experience anxiety

when they have a stroke, particularly when it interferes with their ability to communicate. He testified that father did not appear to be delusional when he examined him and that he did not appear to be suffering from any sort of mental illness.

Finally, the purpose of the surgical procedure was not to eliminate father's mental disorder. DuPriest said that the purpose of the procedure, which involved clearing a blocked carotid artery in his neck, was "to prevent [father] from having another stroke." He said that occasionally such surgery helps people improve from their strokes and that father had definitely improved because his speech is much better. He did not say that having a stroke caused father to become violent or that the surgery could be expected to cure father of his violent outbursts. In fact, he noted that, even after his surgery, when father spoke of the custody hearing, he became very upset, causing his symptoms to worsen a little. The doctor testified that the last time that he had seen father he had "seemed like he was back to what I consider normal." His failure to comment on whether father could be expected to be less violent, however, was likely due to the doctor's lack of any knowledge that father had engaged in domestic violence before the surgery. DuPriest concluded his testimony by saying that there was "no *medical reason* that I know of that [father] shouldn't be able to parent his child." (Emphasis supplied.) However, the condition that is impeding father's ability to care for his children is psychological, not medical. Because DuPriest is neither a psychologist nor a neurosurgeon, there was no reason for him to be aware of father's psychological problems and, of course, no reason for him to treat father for those problems.

■ We conclude that there is clear and convincing evidence that father's emotional and mental problems are of such a nature and duration as to render him incapable of caring for his children. We also conclude that there is clear and convincing evidence that father's lack of effort to adjust his conduct and circumstances after reasonable efforts by social agencies make it appear reasonable that no lasting adjustment can be effected by father. Although father does not specifically argue that the trial court erred in terminating his parental rights as to Faith, the evidence that father's emotional and mental problems render him incapable of being a

parental resource to Rose and his failure to make a lasting adjustment to enable him to become a resource to Rose is evidence that father is equally incapable of caring for Faith. ORS 419B.523(2); *see State ex rel Juv. Dept. v. Miglioretto*, 88 Or App 126, 129, 744 P2d 298 (1987) (need not show harm to specific child if can show harm to another child).[6]

 Father's principal argument that his parental rights should not be terminated is that the state has failed to prove that a lasting adjustment is not going to occur because it has not shown that available social agencies made reasonable efforts to assist him. We disagree. The state is required to make reasonable efforts to assist parents in making the adjustments to enable them to become minimally adequate parents. *State ex rel Juv. Dept. v. Oseguera*, 96 Or App 520, 526, 773 P2d 775 (1989). The type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances. *See, e.g., State ex rel Juv. Dept. v. Gohranson*, 143 Or App 36, 47, 923 P2d 1259, *rev den* 324 Or 395 (1996) (services included group counseling and individual counseling); *State ex rel Juv. Dept. v. DeVore*, 108 Or App 426, 429, 816 P2d 647 (1991) ("Mother agreed not to associate with known sexual offenders or alcoholics, to participate in parent training and to continue counseling."); *State ex rel Juv. Dept. v. Charles*, 123 Or App 229, 235, 859 P2d 1162 (1993), *rev den* 318 Or 326 (1994) (mother counseled to get drug and alcohol treatment). When we evaluate whether the state has made reasonable efforts, we consider those services that were provided *before* the state took custody, as well as those services provided immediately after the removal of the child. *See Charles*, 123 Or App at 235. We also consider whether a parent attempted to make appropriate

---

[6] Our holding in *Miglioretto* was based on *former* ORS 419.523(2), which has been renumbered to ORS 419B.504(2), and which permits the termination of parental rights of a child for conduct towards *any* child that is abuse, cruel or of a sexual nature—a basis under which the state does not seek termination. Nonetheless, it would be illogical and unconscionable to leave any child in a home where the parents are found to be unfit and that it appears that no lasting adjustment can be made, especially where the only reason for a lack of evidence is that the child was born after the first child was removed from the home.

changes in his or her life *after* the state decides to seek termination. *See DeVore*, 108 Or App at 432 ("Despite the specter of the termination of parental rights hanging over her head and being told by CSD since 1988 that she needed to avoid inappropriate relationships, mother had not changed her lifestyle at the time of trial."). Also pertinent is whether the parents "ignored or refused to participate" in plans suggested by the state. *Oseguera*, 96 Or App at 527; *State ex rel Juv. Dept. v. Robinson*, 31 Or App 1097, 1101-02, 572 P2d 336 (1977), *rev den* 281 Or 531 (1978); *State ex rel Juv. Dept. v. Chapman*, 53 Or App 268, 274, 631 P2d 831 (1981), *citing former* ORS 419.523(2)(e) ("the court *shall* consider lack of effort or failure on the part of the parents to make a lasting adjustment").

The record establishes that father was offered significant opportunities to develop and demonstrate his parenting skills and to improve his mental condition and, accordingly, to make the lasting adjustment necessary to prevent termination of his parental rights, but that he failed to take advantage of or benefit from those resources. Offers of assistance to the parents began as early as mother's pregnancy with Rose. Mother was identified as an at-risk parent when she came to her first prenatal doctor visit while she was pregnant with Rose. The nurses noticed in the first few days of Rose's life that mother seemed to be lacking parenting skills. Because of that, a public nurse referred both parents to Healthy Beginnings, a program designed to provide services to first-time parents who have exhibited certain risk factors. Bischofs-Reeves was assigned by Healthy Beginnings to visit the family and provide parenting and homemaking services. She visited weekly at the parent's home for one-and-a-half to three hours per visit until August 1995, when she was told not to visit due to reports of domestic violence in the home. Thereafter, she met with mother outside of the home. She provided both mother and father with information on child development, education, safety, activities to do with the child, discipline techniques, and access to community resources. Although she noted that father seemed to have bonded with the child and was gentle when he held her, she also noted that father rejected all advice from her. Both parents seemed to believe that it was mother's role to care for the basic needs

of the baby and that it was father's role to play with her. Father told the service worker that, as long as mother was alive, it was mother's duty to provide for the physical needs of the child. Father said he was not willing to take over that responsibility unless something happened to mother.[7] Usually, when Bischofs-Reeves would come to the home, father would leave. Mother and father went to a parenting class, but father quit after attending only one class, apparently because of his discomfort at seeing mothers breast-feeding during the class.

Bischofs-Reeves and others were also concerned about the unsafe conditions in the home. Bischofs-Reeves testified that father had wired the couch with electrical current to keep the dogs off the couch.[8] Rose was allowed to wander around the living room in her walker with no protection from the gas heating stove despite suggestions that something be done to protect Rose from burning herself. Father eventually installed some PVC pipe on the floor around the stove to prevent Rose from getting too close in her walker. At other times, newspaper was strewn about near the gas stove. The evidence also shows that, on one occasion, a gun was left by the baby's crib. Another time, a gun was left on the kitchen floor with the safety off. It appeared to the care provider who observed this situation that Rose had been playing on the floor at that time because she had newsprint all over her. Once, Bischofs-Reeves noted a burn on Rose's arm that appeared to have been the result of a cigarette ash falling on her. Mother explained that it had happened accidentally while father was holding Rose and that this was the *third* time that she had been burned in that manner. Mother also told Bischofs-Reeves that father had spanked Rose for chewing on an electrical cord. Both parents refused to child-proof the house and mother stated that Rose would learn not to touch things that she was not supposed to touch.

---

[7] Father told a caseworker, before Rose was removed, that he was "incapable of changing a diaper" because it made him ill. After she was removed, but before he and mother reunited, when asked how he would deal with caring for the child, he said that he would hire someone to care for her and that if he had no choice but to change a diaper he would use rubber gloves and dip the baby's bottom in water to clean her.

[8] Father told her that he unplugged it when Rose was out of her crib.

From October 1994 through January 1995, a contract employee of the Family Resources of Lane County was instructed to provide in-home services to the family as a "parent aide." She explained that a parent aide "goes into the home and provides specific services according to the care plan for the specific family." She said that one of her responsibilities was to provide respite care to the family. She spent three hours each week at the home, providing respite care at no charge. When she told father that she was concerned about safety issues in the house, such as the fact that the couch was electrically charged and that guns were left around the house, father simply got angry and said he did not like the social services people coming to his house. The parent aide suggested other resources from which the parents could benefit, but mother refused them, stating that she didn't want anyone else involved in her life and that she was "fine."

Another service provider, Colleen Stewart, who is the program coordinator for South Lane Family Nursery, also came to the home to check on Rose in January 1995. The program also provides respite care as well as parent support groups. Stewart came to the home twice to counsel the parents and to check on how Rose was doing in regard to her physical development. She also had Rose picked up twice and taken to a nursery. Mother refused to stay very long, and father did not go at all. Stewart's intention was to enroll the parents in an intensive parent education program called Families Together that helps parents set parenting skills goals. However, Rose was removed from the home shortly after Stewart began to provide services for the family.

In August 1995, Libby Marshall of SOSCF called the parents and told them that she had received reports of domestic violence and methamphetamine use and that she was concerned that Rose was not being properly fed or kept clean. Marshall offered the parents homemaking services and access to a relief nursery. She provided services until Rose was removed. One public nurse testified that the parents received *more* than the average amount of services to help them learn to care for their child, because at that time there were abundant services to offer and a budget to pay for the services. Although the service providers said that they focused more on helping mother learn to care for Rose, they

said that they did so only after father rejected their suggestions that he participate.

It is true that, after Rose was taken from the parents, father did regularly attend parenting classes. The classes were voluntary and "self-directed," meaning that the participants determined what aspects of parenting they preferred to learn about. Among the specific questions that mother and father asked were how to develop a baby's mental skills, how to care for a baby having a "temper tantrum" and how to work with a "stubborn" baby. Although the class addressed domestic violence, neither mother nor father admitted that domestic violence was an issue that they needed to work on, and they did not seek to obtain any training on that issue. The director of the program said that she could not say that the parents showed any improvement in their parenting skills because she had no way of knowing how they acted outside of class. Simply attending classes and parroting back the information taught in the class is not enough. There must be some evidence that father used that information to "adjust [his] underlying belief system." *Gohranson*, 143 Or App at 47. No such evidence was offered here.

Father also asserts that he took an anger management class after Rose was removed and that he did "well in it[.]" Father did participate in an anger management class; he was required to by the terms of his sentence for an assault conviction.[9] Father received a certificate of completion, but the certificate is given to anyone who attends a specified number of classes. There is also evidence that father was quite involved and animated in class. However, the facilitator of the class did not feel that father ever accepted responsibility nor felt remorse for his actions in assaulting a relative with a bat:

> "[Father] seemed to be remorseful about it, but primarily because he was concerned about getting custody of his child * * *. So it wasn't as though he was remorseful because you don't hit people; it was because of the consequence of what would happen if he did."

---

[9] Father was convicted of assault in the fourth degree for beating his brother-in-law's legs with a baseball bat.

The facilitator testified that father "pretty much minimized what he had done" and that he "minimized the violence." He testified that he did not believe that father acknowledged the severity of the violence, referring to hitting his brother-in-law as "tapping" him, despite evidence that he hit him so hard that there was some concern that he had broken the victim's legs. Father continually blamed mother for his problems and portrayed himself as the victim. As to how he dealt with his anger, his response was that he was able to "stuff" it and "control" it sometimes. Also, as noted above, father became "enraged" at SOSCF personnel numerous times after the children were removed. Finally, Ewell's report states that anger management training alone was not sufficient to deal with father's problems. In his opinion, father must participate in intensive psychotherapy in order to correct his delusional disorder, which Ewell viewed as the root of his violent behavior.

After the children were removed from the parents, SOSCF workers told father, and his attorneys, what he had to do in order to have the children returned. SOSCF did not have father sign a formal "service agreement," but caseworkers clearly and specifically informed father of what he needed to do. In fact, father did several of the things that he was told to do. He regularly visited the children, underwent a drug and alcohol evaluation and got a psychological evaluation. As noted above, he also attended parenting classes and anger management classes. However, when Marshall told father that she had concerns regarding domestic violence, father denied that he had a problem. Cynthia Fellez, a social services specialist who took over the case in March 1995, testified that, when she first approached father about changes that he had to make, he was willing to listen, but that when she told him that he would need to deal with the domestic violence, he became "irate."

Father also refused to do the one thing that Ewell recommended and that a SOSCF worker told him in April 1995, that he must do to get the children back—engage in intensive one-on-one psychotherapy. When father was first told by a caseworker that he needed to obtain intensive psychotherapy, he seemed receptive, saying that he would do so

within 30 days. The caseworker testified that as the termination proceeding approached, however, father became angry and said that he did not have to get the therapy and that instead he would hire a new attorney:

> "And at that point, when the decision had come to file for a termination petition, I told him that he still had an opportunity to do what was recommended, that there are times when we get close to a termination hearing where we will pull back if you are in compliance: He needed to do the anger management. He needed to get himself involved in intensive therapies for, you know, his delusional thinking, I guess, you know, was what the diagnosis was. And he just said he would fight."

The dissent takes the position that there was a "rush" to seek termination in this case. We disagree. Rose was removed from the parents in January 1995. Almost a year later, SOSCF filed the petitions to terminate the parents' rights as to Rose. It was more than a year-and-a-half before trial was held on the petitions. Further, the evidence shows that SOSCF worked with the parents after Rose was removed. It was only after it became clear that the parents were not willing to get the mental health treatment that the experts said was needed that the agency filed to terminate their parental rights. Finally, and significantly, there is no evidence that father had, even up to the date of the trial, sought out mental health treatment or indicated any intention to do so.

Father asserts, on appeal, that because the state did not help him find the required therapy at no cost, it failed to meet its duty to make reasonable efforts to assist him in becoming a minimally adequate parent. However, there is no evidence that father ever requested assistance in finding a psychotherapist, much less one provided by the state at no cost to him. To the contrary, the evidence shows that the reason father did not get therapy is because he believed that he did not need it, despite the psychotherapist's diagnosis and recommendation.[10] In our view, not only has there been no

---

[10] The trial was held one year and eight months after Rose was taken into custody, yet father had not yet attended a single psychotherapy class. Indeed, there is no evidence that he is even now willing to participate in psychotherapy in order to get back custody of his children.

"significant progress" shown here, there is *no* evidence that father has made *any* progress toward adjustment of his behavior. Accordingly, we hold that the state has proven by clear and convincing evidence, based on ORS 419B.504(1) and (5), that father is unfit by reason of conduct or conditions seriously detrimental to his children and that integration of the children into his home is improbable in the foreseeable future because it is unlikely that the conduct or conditions will change.

 Mother also contends that the trial court erred in terminating her parental rights. The petitions for termination alleged that mother's parental rights should be terminated based on the following:

> "[M]other is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable in the foreseeable future due to conduct or conditions not likely to change, including, but not limited to the following:
>
> "(a) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
>
> "(b) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the mother incapable of providing care for extended periods of time.
>
> "(c) Physical and emotional neglect of the child.
>
> "(d) Lack of effort to adjust the mother's circumstances, conduct or conditions to make return of the child to the mother possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."[11]

Mother argues that the trial court erred in terminating her parental rights because the state failed to meet its burden of proof on the issue of whether she was unfit and because the state failed to provide her with services necessary to reintegrate the children into her home. We conclude

---

[11] The petitions for termination of mother's parental rights for both children were identical.

that the state has proven by clear and convincing evidence that mother is unfit due to her mental deficiencies, her physical and emotional neglect of Rose and her inability to adjust her circumstances to make return of the children possible within a reasonable amount of time. ORS 419B.504(1), (4) and (5); *DeVore*, 108 Or App at 431.

As discussed above, in the first few days of Rose's life, nurses expressed concern about mother's parenting skills, noting that she was behaving

> "in a very inappropriate manner, speaking gruffly to [the] baby * * *. At one point [mother] scolded [the] baby saying, 'No. You've eaten already' and she covered the baby's face with her blouse. Another time she sternly said, 'Now go to sleep.'"

The medical staff also noted that mother handled Rose roughly. At trial, a public health nurse testified that mother's behavior was like "red flags on the top of the flag pole. It doesn't get any brighter and redder than that." When Rose was one week old, another public health nurse visited the house. She, too, noticed that mother was very gruff with Rose and that she acted like she had no idea what to do with a baby. Before the month was over, the public nurse had referred the parents to Healthy Beginnings, a program designed to provide services to first-time parents who have exhibited certain risk factors.

On her first visit, Bischofs-Reeves heard mother call Rose a "brat" in a tone that was not at all playful. Bischofs-Reeves and others noted that mother never seemed to bond with the child. Mother rarely cuddled Rose, played with her or spoke to her. When she did speak to her, it was often gruffly. She often asked other people to take the baby. She said that she thought that the baby "hated" her. She stated that her job was simply to care for the baby, that it was father's job to play with her. Bischofs-Reeves testified that during the time that she worked with mother, mother's parenting skills showed little improvement.

Rose often suffered diarrhea, vomiting, fevers and thrush in her mouth. Bischofs-Reeves testified that she tried to explain to mother that the problems were probably due to

inappropriate feeding, but mother rejected her advice. For example, when mother was feeding the baby tastes of pizza at seven-and-one-half months old, and Bischofs-Reeves explained that the child's digestive system was not ready to properly digest such foods, mother brushed her off, saying that Rose liked these foods and that she was going to continue to feed them to her. This was after Bischofs-Reeves had been telling mother for months that Rose should not be eating solid foods yet. Mother also did not feed the child for long periods of time, saying that she did not want to spoil her. At one point, she gave the baby only water at night. Although Bischofs-Reeves continually told mother that Rose's formula must be kept refrigerated, the service provider often found it sitting out, which could cause it to spoil. When mother did refrigerate the formula, she would not warm the formula before feeding it to the child. Despite warnings from Bischofs-Reeves that switching brands of formula can cause infants stomach discomfort, mother continued to change Rose's formula haphazardly.

Often when Bischofs-Reeves visited, Rose was dirty. On a visit in August, when the child was four months old, Bischofs-Reeves found that Rose's clothes were completely soaked with "spit-up" and that her hair was matted.[12] Mother told Bischofs-Reeves that she had not given Rose a bath that day or the day before. Several people stated that the house was very dirty, primarily from dog hair. On the other hand, there was other, conflicting, testimony that although the house was cluttered, it was not overly dirty. Bischofs-Reeves and others were also concerned about the unsafe conditions in the home as described above.

The record also shows that mother often exhibited her lack of understanding of child development. For example, the public health nurse reported that in October 1994, when Rose was about five or six months old, mother "popped" Rose on the bottom because the baby was heading for a shoe that was at the edge of the blanket that she was playing on. Mother told Rose, "That's enough of that. You know better than that." When Rose began to cry, mother told her, "Don't

---

[12] One caseworker said that she did not know that Rose had blonde hair until after she was placed in a foster home where her hair was washed regularly.

you pull that on me. You know that doesn't work with me" in a tone of voice that the nurse said was inappropriate. The care provider that witnessed and described the situation likened it to a "drive-by" because mother came out of nowhere and swatted the baby without warning. She also said that the discipline was inappropriate because the "punishment did not fit the crime" and because "a baby can no sooner stop its crying at five months than arrange for the sunset." The next month, the care provider witnessed an incident in which Rose pulled mother's hair while mother held her. Mother slapped Rose on the hand and started counting to three as if she expected the child to understand that she was being disciplined. Similarly, Dr. Holo, the doctor to whom parents took Rose for ear infections and a severe case of diaper rash, testified to the parents's inappropriate expectations of Rose in light of her age.

Mother generally was good about taking Rose to the doctor when she was ill or when she needed immunizations. The first time the doctor examined Rose, in November 1994, she had an upper respiratory tract infection and an ear infection that had "finally perforated," However, Holo testified that she was also concerned about "obvious physical neglect of the child."

"Q: What was the condition of the child?

"Holo: At that time the child appeared to be quite dirty and was not fed, had not been fed for about six hours, so it was very fussy and appeared to be very hungry. And I did see the baby in the office because the mother had nothing for the child to eat at the time.

"Q: Did the mother tell you that the child hadn't eaten for six hours?

"Holo: Yes, she did.

"Q: What is the normal interval between feedings for a child of that age?

"Holo: For a six-month-old, probably three to four hours and they would be getting hungry.

"Q: What statements did the mother make at that time?

"Holo: She stated to me many times during that visit that she was burned out. She stated, 'This is not fun. I don't like this.' She said, 'I'm tired' many times and she stated the dad won't do things for her, 'but he would never let me give her to someone else to care for.' "

Holo testified that the statement that "he would never let me give her to someone else to care for" followed her question about whether mother had ever thought about placing the child in foster care or allowing her to be adopted, which she said she asked in light of mother's numerous comments about being burned out.

During the next visit, on December 21, Holo saw further evidence that Rose was being neglected.

"Q: What was the purpose of that visit?

"Holo: That was for a diaper rash. And what we noticed at that time was that the—and nurse noticed this also, that the child had dirt caked behind the ears, had a very bad diaper rash, as though she had not been changed, you know, frequently at that time.

"Q: "Did you notice anything about the condition of the child's walker?

"* * * * *

"Holo: Yes. It was very dirty, and there was—her clothing was very dirty also and covered with dog hair, and her hair was sticky and matted with food. The diaper was falling apart it was so wet, and she was covered with drying feces at that time.

"Q: Did you make a comment about the child's being cute to the mother?

"Holo: I did say that. I said she's very cute, and the mother said, 'You take her home then.' "

Holo testified that she did not feel that mother was meeting even minimal standards for parenting. At some point in the visit, mother told the doctor's nurse that she always kept a loaded gun at her side and that a loaded gun was kept leaning against a wall in the house where the child was present.

As noted above, in mid-July 1994, mother told Bischofs-Reeves that father had gone into a rage because he

had run out of drugs. She said that in his rage he had broken glass and dumped cereal on the floor. Several weeks later, mother told Bischofs-Reeves that father had tried to strangle her and had put a gun to her head while she had Rose in her arms. Bischofs-Reeves referred mother to Womenspace, a women's shelter for domestic violence victims. Mother went to the shelter and told the coordinator the same story that she had told Bischofs-Reeves. Mother filed for a restraining order in which she related that, in addition to holding a gun to her head at that time, father had threatened her before and that she feared for her life. However, she "pulled" the restraining order two days later. She said she did so because father was scheduled for trial on an assault charge, and she was afraid that the restraining order would influence the outcome. Despite Bischofs-Reeves' recommendation to the contrary, mother returned to father. Mother was offered, at no cost, services for battered women while at Womenspace, but she chose not to accept those services.

SOSCF first became involved on August 17, 1994, when Marshall of SOSCF called the parents and told them she had received reports of domestic violence and methamphetamine use and that she was concerned that Rose was not being properly fed or kept clean. Mother admitted to Marshall that she and father had had a "major" fight, but denied that father had held a gun to her head, claiming that instead he was just handing it to her, not pointing it at her. Mother failed to keep an appointment with Marshall on August 26. Marshall then came to the parents' home on September 21. Marshall noted that mother did not hold Rose, asserting that it was "too hot." Marshall offered the parents homemaking services and access to a relief nursery. The parents did occasionally take Rose to the relief nursery. On a subsequent visit, Marshall suggested counseling to mother because she was worried about the domestic abuse. Mother indicated that she would go see a counselor that she had seen in high school to help her deal with her sexual abuse issues. There is no evidence, however, that she did so.

In October 1994, the parent aide from Lane County Resources began providing weekly in-home services at no charge. As late as January, the respite provider noted that mother slept during most of her home visits. She said that

when she would arrive, Rose's diaper would be soaked with urine. She said that mother would not allow her to put medicine on the baby's diaper rash. Mother also told her not to hold Rose during visits because it just made the child want to be held after she left. Mother "didn't respond positively" to any of the respite provider's suggestions in caring for Rose. The respite provider testified that mother did not hold the baby much and that she handled Rose roughly, one time "nearly throwing her in the crib." She had many of the same concerns that Bischofs-Reeves had testified to including mother's failure to warm Rose's bottle before feeding her (mother said that warming the bottle would "spoil her and she was getting too used to it"), leaving guns around the home (mother said that she had once shot at some people that were bothering her and father, but that she had missed the people but had hit their motor home) and other safety issues, such as having the couch wired with electricity.

A program coordinator for South Lane Family Nursery came to the home to check on Rose in early January 1995. She asked mother to take Rose out of her crib so that she could see how well Rose was doing developmentally. The program coordinator testified that mother picked Rose up with her arms held straight out away from her body and "kind of plopped her on the ground." She said that mother did not show any interest in the child during the entire visit and exhibited no attachment to her. The program coordinator said that Rose's movements indicated that she had not had much opportunity to develop her large motor muscles. As the dissent points out, over the period of time that Rose was being evaluated, her social skills and language skills were in the "average" range. However, there is also evidence that all of her skills were deteriorating. The dissent concludes that this evidence shows only that mother was in need of services and not that she is an unfit parent due to neglect. We agree with the dissent that the evidence shows that mother was in need of services. However, the evidence also shows that services were being provided and that, despite the services, mother's parenting skills were not improving.

From July 1994 through January 1995, mother reported at least three incidents where father had threatened her with a gun, as described above. After the final incident in

January, in which Rose was removed from the parties' home, the parties separated, with father remaining in the home and mother going to stay with an aunt for several months. While separated, each party accused the other of drug abuse and neglecting Rose.

Mother was offered counseling in March 1995, but she declined the offer. At the request of a caseworker at SOSCF, both parties underwent psychological examinations by Ewell in April 1995. Both also had drug and alcohol evaluations and attended regular visitations with Rose. At the recommendation of SOSCF, mother voluntarily attended parenting classes. However, Rose was not returned to mother at that time because, as the facilitator of the program testified, although mother attended the classes, she did not seem to be actually able to apply what she had learned and there was no noticeable improvement in her parenting skills. Also, the caseworker was concerned because she was uncertain about where mother was living and the status of the parties' relationship. Additionally, although mother at one point said that she wanted Rose returned and other "numerous" times stating that she did not want to be a parent.

On June 23, 1995, the caseworker told the parents that they were going to seek termination of their parental rights. The caseworker said that mother seemed unaffected by the news and even stated that she would sign her rights to Rose over to father:

> "A: And, you know, I—you know, I was trying to keep things, again, on track, trying to explain that we have—you know, we have concerns about both of them, this was not, you know, like hot potato, hot potato, you just pass it on, that he needed to do some things, she needed to do some things in order for them to be considered resources. I said, you know, 'Understand this question clearly: Are you then, therefore, saying you do not want to be a parental resource to Rose?' And she said, 'Yes, I don't.' And I said, 'You're clear, are you not? You don't want this?' And she said, 'No, I don't want this.'
>
> "Q: Okay.
>
> "A: And she would sign releases."

A new caseworker assigned to the case said that, after Rose was taken, she spoke to the parents' attorneys about 20 times about available services, but that the parents never requested anything other than a copy of the psychologist's report. On September 28, 1995, eight months after removing Rose from the parent's house, SOSCF petitioned to terminate the parents' rights in regards to Rose. At some point during this period, the parties had reconciled and were attending visits with Rose together. About the time that the state decided to seek termination, mother became pregnant with Faith. Mother did not attend visitations with Rose after Faith was born because she learned that SOSCF intended to take custody of the baby. Instead, mother absconded with Faith in an apparent attempt to prevent Faith's removal by SOSCF.[13] During this time, the parties were again separated. When Faith was found, she was in the arms of the man that mother had said had sexually abused her as a child. Faith was removed from mother's custody about three weeks before trial. By the time of trial, the parties had again reunited.

In concluding that there was not clear and convincing evidence that mother was unfit due to neglect, the dissent focuses on particular pieces of evidence and concludes that that particular evidence does not provide clear and convincing proof that mother was unfit. However, when all of the circumstances regarding mother's care of the children are considered, the evidence supports the conclusion that mother was unfit as a result of her neglect of the children. The trial court, in its explanation of why it was terminating mother's parental rights, identified a critical fact in this case: mother's behavior had shown a consistent pattern of alternatively alleging, then denying abuse by father and alternatively pursuing, then withdrawing interest in parenting. That pattern demonstrates that it is highly unlikely that mother will, within a reasonable amount of time, be able, or willing, to *consistently* care for the children in a safe environment.

---

[13] The dissent is wrong in stating that SOSCF took custody of Faith immediately after she was born; first they had to locate her to remove her from mother who had absconded with the child.

When the *entire* circumstances are considered here, there is no question that mother's unfitness has been established by clear and convincing evidence. The record shows that, despite an outpouring of services and attempts to help her learn to parent, mother did not bond with Rose, did little to provide her with the emotional support that she needed, fed her in ways that caused the child to be sick and that could have resulted in malnutrition,[14] did not keep the child or the child's environment clean and, despite urgings from the service providers to correct some safety problems, she refused to make an effort to keep the house in a condition that was safe for an infant or a toddler. Although mother did go to parenting classes after Rose was removed, there was no indication that she benefitted from the classes. Simply attending classes is not enough. *Gohranson*, 143 Or App at 42. Mother must absorb and apply the information to her own family to demonstrate that she has made efforts to adjust her behavior to allow the reintegration of the children into the home. *Id.* In other words, she must not only understand what behavior she must change, she must also "adjust her underlying belief system." *Id.* Mother's failure to change or improve her parenting skills clearly shows her inability or unwillingness to adjust her underlying belief system. Mother's ambivalence about the potential termination of her parental rights as to Rose, even as termination was impending, is a telling indicator of her attitude toward her child.

■ Our conclusion that mother has physically and emotionally neglected her children is also supported by evidence that she is incapable of protecting her children from abuse and danger. The psychological and physical abuse father inflicted on mother, although perhaps not directed at the Rose, often placed the child in harm's way. In the situation described above in which father angrily confronted mother in front of the SOSCF worker, mother's action in placing Rose between herself and father and "cowering" demonstrates

---

[14] We agree with the dissent that there is no evidence that Rose suffered from malnutrition at the time of her removal. However, there is evidence that mother sometimes did not feed Rose for extended lengths of time that were inadequate for an infant and that mother continually fed the child different types of formula and sometime did not properly store her formula or warm it before feeding the child, all of which led to the child suffering from gastrointestinal discomfort.

that mother is willing to shield herself from harm by placing the child between father and herself and that father, at a minimum, psychologically dominates mother. Mother's conduct clearly shows that she is unable to recognize the dangers presented to her children by father's behavior and does not know how to protect her children from violence in the home. Mother has continually reconciled with father and defended him.

■ Even after Rose was taken, mother demonstrated that she could not or would not protect her children. When Faith was finally located, a police officer had to restrain mother from assaulting the SOSCF worker who had accompanied him and, when he attempted to take custody of Faith, the man who mother said had sexually abused her throughout her childhood ran away with Faith in his arms. Without question, allowing a man who abused her to have access to her child shows an astounding inability or unwillingness to protect her child from abuse. *DeVore*, 108 Or App at 431.

The dissent emphasizes the fact that the state did not remove Rose until mother reported that father had pointed a gun at her, choked her and threatened to kill her. Certainly father's violent behavior served as a catalyst to remove Rose from the home. The dissent asserts that the state would not have petitioned the terminate the parents' parental rights but for father's violence toward mother. However, the evidence shows that Marshall of SOSCF first intervened because she had received reports of domestic violence and methamphetamine use *and* because she was concerned that Rose was not being properly fed or kept clean. Clearly, Marshall was concerned with issues of neglect relating to mother's inability to care for the child as well as with mother's inability to protect the child from violence in the home. Considering the totality of the evidence, we conclude that there is clear and convincing evidence that mother has physically and emotionally neglected Rose and is unable to protect her from harm. ORS 419B.504(4).

■ With respect to Faith, mother argues that the only evidence regarding Faith is that she was "well fed and healthy, she was clean, and that there was a very loving bond between Faith and her mother." We assume that mother is

attempting to argue that the state must show that Faith suffered abuse during her short time with mother in order for mother's parental rights to be terminated as to that child.[15] That is not correct. *See Miglioretto*, 88 Or App at 129 ("ORS 419.523(2) does not require that [a] child remain in an abusive environment until the state can show that abuse of that particular child has occurred. If there is evidence of abuse of *any* child, the statute permits a court to remove a child permanently from a dangerous situation.") (emphasis in original). Accordingly, we may consider whether mother's behavior affected Rose negatively in our determination of whether her parental rights should be terminated as to Faith. We conclude that the evidence of mother's neglect of Rose, and the dangerous environment to which the child was exposed, support the termination of mother's parental rights to Faith.

The termination of mother's rights is also supported, standing alone, by clear and convincing evidence that mother's mental condition rendered her incapable of providing care to her children. Ewell concluded from his psychological examination of mother that she suffers from "borderline intellectual ability, a personality disorder and [ ] psycho/ social confusion:"

> "[Mother's] cognitive deficiencies, her personality disorder and history of long-term sexual abuse within a highly dysfunctional family, all render her incapable of parenting at this time. Her level of social judgment, problem-solving and sensitivity are grossly impaired. Reasoning is highly concrete and nearly void of empathy. At the time of this assessment, [mother] did not seem to realize that any of these problems were in existence.

> "[Mother] is in need of long-term, individualized psychotherapy. Intervention will need to be tailored to her own level of cognitive ability. I doubt that she would be able to benefit from group forms of intervention. The learning which took place within her childhood and the role models she had of how a family should function, were inadequate. In addition to insight oriented psychotherapy, [mother] will

---

[15] Mother's statement also is an incorrect statement of the facts in the record. As discussed above, there is evidence that mother placed Faith in danger by allowing the man who had sexually abused mother to watch Faith when mother was attempting to elude SOSCF.

need to be taught basic skills of self-management and interpersonal communication.

"[Mother] will also require parenting classes and homemaker skill building. This case will necessitate long-term monitoring and supervising. The prognosis for change is poor. There is a high risk of [mother] entering intimate relationships with abusive, or otherwise domineering men.

"[T]he barriers [mother] faces in becoming an appropriate parental resource include borderline intellectual ability, a personality disorder and the psycho/social confusion caused by years of living within a dysfunctional, sexualized family environment. As a result, she does not currently comprehend the devastating nature of these conditions and her own need to seek treatment. Under the most optimistic scenario, [mother] will probably require a year to two years intensive intervention, followed by long-term monitoring and supervision. Without successfully completing this level of treatment, her condition is not likely to spontaneously improve."

Ewell's testimony was consistent with his report. The state met its burden of proof as to ORS 419B.504(1).

There is also clear and convincing evidence that mother failed to make a lasting adjustment after reasonable efforts by available social agencies. ORS 419B.504(5). As did father, mother asserts that the state failed to provide her the services that would allow her to change her circumstances and conditions. However, the evidence is clear and convincing that mother was given opportunities for assistance. In addition to the numerous services provided to mother that are discussed above, mother rejected offers from Womenspace for dealing with her current abuse problems and apparently did not follow up on promises that she would speak to her high school counselor about her past sexual abuse issues. SOSCF informed mother and her attorney that intensive psychotherapy was needed before the children could be returned. Mother did not seek such treatment on her own and she does not assert that she asked the state to assist her in finding the appropriate treatment.

In light of the fact that mother continually refused to acknowledge that she needed psychological treatment, the state did all that was reasonable to assist her in effecting a

lasting adjustment by informing her and her counsel that she would need to complete intensive psychotherapy before the children could be returned. *Compare Charles*, 123 Or App at 235-36 *with State ex rel CSD v. Brady*, 135 Or App 332, 342, 899 P2d 691, *rev den* 322 Or 360 (1995). A parent may not stand by passively when informed of the measures that must be taken to avoid termination of parental rights and then claim a lack of effort on the part of the state because of parental inaction. *See Boren*, 105 Or App at 607 (termination appropriate where father failed to respond to present a plan for reintegrating child into home); *Robinson*, 31 Or App at 1101-02 (termination appropriate where mother ignored or refused to participate in any programs suggested by CSD).

 Further, while it is certainly in a child's best interest to be reintegrated into a family, if possible, there must be some probability that might happen. *Boren*, 105 Or App at 610. Children should not be placed in foster care indefinitely in the face of evidence that the parent will not be able to become a minimally adequate parent in a reasonable period of time. *See Geist*, 310 Or at 189 (termination is in the best interests of the children where parent is unable or unwilling to rehabilitate herself within a reasonable amount of time to provide a wholesome and healthful environment); *State ex rel Juv. Dept. v. McDonald*, 38 Or App 399, 401, 590 P2d 289, *rev den* 286 Or 149 (1979). The evidence here is clear and convincing that treatment is necessary for both mother and father if there is to be *any* chance that either of them could become a resource for the children. We see no evidence that either of the parents was or is willing to get the necessary treatment.

In sum, this is not a case where the parents were attempting to change their conduct or conditions but were thwarted by the state. The parents were given abundant resources with which to learn to parent and to maintain a safe and clean household. They rejected most advice and continued to treat recommendations from the state with indifference. Both parents denied that they needed help with serious psychological problems and rejected SOSCF's requirement that they obtain treatment. Any further efforts by the state to assist mother and father in regard to their need to receive therapy would have been futile. *See Miglioretto*, 88 Or App at

129 (where, rather than being willing to work to change his sexually abusive behavior towards children, father continues to deny that it occurred, testimony from psychologists that there is "little likelihood that he will change whatever behavior patterns he currently has" supports holding that father is unfit). The trial court did not err in terminating mother's and father's parental rights.

Affirmed.

**EDMONDS, J.,** dissenting.

The majority holds that the state has met its burden of proving by clear and convincing evidence that mother and father's parental rights ought to be terminated. At stake in this case is the application of a fundamental principle about the quantum of proof necessary to terminate parental rights. Because that principle transcends any termination case and because I believe that the evidence is lacking in this case to meet that standard, I dissent.

I begin with the axiom that the state must prove the allegations that it made in its petition, *see State ex rel Juv. Dept. v. Jones*, 290 Or 799, 810, 626 P2d 882 (1981), and that it must prove at least one of those allegations by clear and convincing evidence in order to prevail. ORS 419B.521. The state alleges that mother's parental rights ought to be terminated "by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change." ORS 419B.504. The state further alleges the following grounds for termination under ORS 419B.504:

"(a) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(b) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the mother incapable of providing care for extended periods of time.

"(c) Physical and emotional neglect of the child.

"(d) Lack of effort to adjust the mother's circumstances, conduct or conditions to make return of the child possible, or failure to effect a lasting adjustment after reasonable efforts by social agencies for such extended periods of time that it appears reasonable that no lasting adjustment can be effected."

The state makes similar allegations against father.

The trial court concluded that the state did not meet its burden of proof with respect to the allegations against mother of impairment of parental ability because of substance abuse and physical and emotional neglect of Rose, but did prove its allegations regarding mental deficiencies and lack of effort by her to adjust her circumstances. The majority, on *de novo* review, goes beyond the trial court's conclusions and holds that the state also proved that mother is unfit because of physical and emotional neglect.[1] Regarding the allegation of neglect, the majority concludes:

"When the *entire* circumstances are considered here, there is no question that mother's unfitness has been established by clear and convincing evidence. The record shows that, despite an outpouring of services and attempts to help her learn to parent, mother did not bond with Rose, did little to provide her with the emotional support that she needed, fed her in ways that caused the child to be sick and which could have resulted in malnutrition, did not keep the child or the child's environment clean and despite urgings from the service providers to correct some safety problems, she refused to make an effort to keep the house in a condition that was safe for an infant or a toddler." 152 Or App at 598 (footnote omitted).

In arriving at its conclusion, the majority overlooks a great deal of objective evidence, (often provided by the state's own witnesses), that, when considered in combination with the evidence recounted in the majority opinion, serves to support the trial court's conclusion that the state failed to meet its burden of proof.

Before Rose was born, mother obtained prenatal care. The County Health Department identified mother as an

---

[1] The majority agrees with the trial court that the state failed to prove that father was unfit due to substance abuse and neglect.

"at-risk" parent based on several factors, including her youth, the fact that she was a first-time mother and her apparent lack of a viable family support system. When Rose was born in April 1994, she was a healthy baby. After Rose was born, the staff at the hospital also expressed concerns about mother's behavior toward Rose. They referred mother to "Healthy Beginnings," a voluntary program designed to help at-risk first-time mothers. Mother voluntarily participated in the program, which included frequent home visits by parenting counselors to provide instruction, regular assessments of the child's development and group support meetings for the parents. As a result, mother's care of Rose was regularly observed during the nine months that Rose was in her parents' custody.

Additionally, Rose was being seen by Dr. Holo, a pediatrician, during this time. She testified that mother brought Rose to her office for treatment for nine different visits. She noted concerns about Rose's cleanliness on two occasions but testified that she saw no signs of significant medical problems beyond an ear infection and diaper rash and that there was never any evidence of physical or sexual abuse. Contrary to the majority's speculation regarding mother's feeding practices, there is absolutely no evidence in the record to indicate that Rose suffered from malnutrition. In fact, Holo testified that, over the course of her treatment of Rose while she was in mother's care, "[Rose] did appear to be generally in overall good health."

Regarding evidence that mother had not bonded with Rose, the majority opinion neglects to note that Holo's partner, Dr. Geisler, who treated Rose for an ear infection, was of the opinion that mother had bonded with Rose. She also made the following note in Rose's chart: "I spoke to Mom at great lengths. She is very loving and caring. Brought [Rose] in for concerns about the ear but had a poor understanding of child rearing." Furthermore, mother's aunt observed mother and Rose together before Rose was removed by the state. She testified:

"A They got along fine. [Mother] would bring her over before CSD had her to visit with me. She always made sure that she was clean. Whenever her diaper was wet, she

changed her. When she fussed, she seen if she was hungry, took care of that. She would hold her. She played with her. She had toys that she played with her.

"Q Did she love the child?

"A Yes, very much.

"Q Did the child love her?

"A Yes."

The majority relates that the program coordinator for the South Lane Family Nursery visited the home in January 1995 and "said that Rose's movements indicated that she had not had much opportunity to develop her large motor muscles." 152 Or App at 595. It fails to point out, however, that Rose's development was being regularly evaluated by the Healthy Beginnings program. In September 1994 (when Rose was 21 weeks old), Rose's chart from the program's counselors states that her motor skills were normal. Furthermore, at the age of 21 weeks, its assessment reflects that Rose had the social skills of a 28-week old child and the language skills of a 30-week old child. The only area where Rose tested "questionable" was in "adaptive ability," where her score was between low normal and high questionable. The Healthy Beginnings worker who performed the assessment testified:

"At this point I don't refer the child to see the RC.[2] I don't call the doctor. I don't go through any big hoops except to say, 'Hmm. It looks like 85, 86 [borderline normal/questionable].' There's no, honest to God, difference between those two [scores] except that we need to start paying more attention to the child.

"So let me give you some tricks to do with your kid. I want you to put a mobile above her bed. I want you to change her crib to the other side of her room. I want you to take her outside. I want you to dangle a toy and do this. 85, 86 doesn't matter. My role, when I get a score that's at that level, as I say, is 'Hmm. It's time to intervene. Do these things. I'll come back next time and test again.' And that's

---

[2] We are unable to determine from the record what the witness meant when she referred to the "RC."

what happened at the 35 weeks' time, and it went up. *She came back to normal.*" (Emphasis supplied.)

A 35-week assessment was performed in December 1994 by the worker before Rose was removed from the home on January 24, 1995. Contrary to the majority's assertion that "all of her skills were deteriorating," 152 Or App at 595, Rose's adaptive score actually improved to the normal range. Furthermore, the worker's testimony admits to the inference that the improvement could be attributed to the parents following her advice after the 21-week assessment. As the majority correctly notes, all of the other areas that were assessed, while lower than the September assessment, remained in the normal range with the exception of Rose's gross motor skills, which had dropped into the questionable range. The service provider attributed the low gross motor skills score to the parents leaving Rose in her crib and walker too much of the time, which restricted her movements. On balance, the developmental assessment evidence serves to verify what the public health department and hospital staff suspected from the outset: mother was in need of services. It does not, however, prove that termination of mother's parental rights was necessary due to neglect.[3] For the majority to hold that mother's parental rights ought to be terminated because of neglect on this record is unprecedented in our case law, and its holding evidences a complete disregard of the need for evidence that is clear and convincing or highly probable to support that action.

The same deficit pervades the majority's analysis regarding the home environment. As the majority opinion concedes, the evidence regarding the cleanliness of the parents' home is conflicting. There are reports of concern about excessive amounts of dog hair present in the home. However,

---

[3] The majority responds that, "We agree with the dissent that the evidence shows that mother was in need of services. However, the evidence also shows that services were being provided and that, despite the services, mother's parenting skills were not improving." 152 Or App at 595. That statement, even if correct, does not complete the analysis. The termination of parental rights for neglect requires more than the demonstration of deficiencies in parenting abilities. Moreover, the evidence demonstrates that mother became involved in several parenting improvement programs after Rose was removed, but never has had the opportunity to have custody of her children and to demonstrate that she has benefitted from her participation in them.

as late as October 1994, the State Office of Service to Children and Families (SOSCF) "Family Resource Worker Plan," under the category of "Strengths and Supports," indicated that the parents' house was "neat and clean." Rose was removed from the family home three months later. Despite SOSCF's findings, the majority concludes that mother was an unfit parent because she "did not keep * * * the child's environment clean." 152 Or App at 598. Apparently, in the view of the majority, evidence of excessive amounts of dog hair in the home is enough to carry the state's burden to prove its allegations by clear and convincing evidence. In sum, the evidence simply does not support the majority's conclusions. Again, the state has failed to prove that mother was unfit in this regard by the requisite standard.

Finally, the majority opinion relates concerns about the safety of the home environment as proof that mother was an unfit parent due to neglect. Although it is correct that father told the service providers that he had wired the couch with electricity to keep the dog off of it, he also told them that he disconnected the power when Rose was up and about. Even though father's action was unwise, there is no evidence that Rose experienced any harm from it. When the service providers expressed concern about Rose being able to push her walker against the gas stove, father built a PVC pipe barricade to prevent that occurrence from happening. Again, there is no evidence that Rose was ever harmed by the gas stove. There was a report about loaded guns being left around Rose. SOSCF investigated the report and concluded that it was " 'unfounded' for threat of harm." Mother voluntarily acknowledged that Rose had been burned on one occasion when ash from father's cigarettes accidentally fell on her arm. Mother also reported that there were two similar accidents in the past, but those incidents were not investigated. Despite those reports, none of the professionals monitoring the home environment acted to remove Rose from the parents' home at the time. Their inaction is a significant comment on how they viewed the seriousness of the conditions of the home at the time of their observations. Their inaction also gives rise to the inference that their testimony at trial constituted a belated effort to support the state's allegations, an effort that proved unsatisfactory in the eyes of the trial

court. In all, the majority's conclusion that the state carried its burden of proof in regard to neglect is belied by the observations of Rose's physicians and the actions of those who were regularly monitoring the home environment.

In *State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 799 P2d 694 (1990), we held that even though another environment might maximize the potential of the children in that case, the parental rights of the mother could only be terminated when the state showed by clear and convincing evidence that the mother could not perform her role with minimal adequacy. Accordingly, we reversed the trial court's decision to terminate the parent's rights. That case also involved a parent who undertook diligent efforts to improve her parenting skills and did not have the opportunity to demonstrate her ability or inability in the foreseeable future. In contrast, the majority accuses me of "focus[ing] on particular pieces of evidence and concludes that that particular evidence does not provide clear and convincing proof that mother was unfit." 152 Or App at 597. To the extent that I have given weight to credible mitigating evidence that was before the trial court and evidence that did not find its way into the majority opinion, I stand guilty as charged. After all, *de novo* review requires a focus on particular evidence in light of all the circumstances as part of a dispassionate, balanced approach in adjudicating whether the allegations of the petition have been proven by clear and convincing evidence.

The majority cites *State ex rel Juv. Dept. v. Miglioretto*, 88 Or App 126, 744 P2d 298 (1971), and then uses its holding as a springboard regarding its analysis about the care of Faith. As a result, it incorrectly concludes that under ORS 419B.504(d), evidence that mother neglected Rose is sufficient to terminate mother's parental rights in Faith on the ground of neglect in the absence of clear and convincing evidence of neglect of Faith. First, the majority's factual predicates are not supported by the record. The evidence from Rose's care providers during the time that mother had custody is that while there were some deficiencies in mother's care that were capable of correction, Rose was a healthy baby at the time that SOSCF took custody. Second, the majority paints a much bleaker picture of mother's care of Faith than the record supports. It is correct that mother was concerned

that Faith could be seized by SOSCF when she was born on May 3, 1996. The petition to terminate parental rights in Faith was filed on June 28, 1996, and the warrant for her custody was issued on May 29, 1996. At the time of Faith's birth, mother was under no legal obligation to surrender Faith to SOSCF. When SOSCF found Faith, she was being held in the arms of an individual who mother had accused of abuse of mother as a teenager. Mother was in the same building at the time talking to the police. There is no evidence that Faith had been entrusted to the "care" of mother's abuser or that her abuser presented a risk of sexual abuse to an infant. Also, there is no evidence that mother had neglected Faith during the time that Faith was in her care and custody.

Finally, in this regard, the majority commits legal error when it holds that evidence that mother neglected Rose is sufficient evidence to terminate mother's parental rights to Faith. In *Miglioretto,* we held that where *former* ORS 419.523(2)(b)[4] provided that parental rights in a child could be terminated if the state proved that the parent had engaged in "[c]onduct toward *any* child of an abusive, cruel or sexual nature," (emphasis supplied) that evidence of such conduct need not have been directed at the child who was the subject of the termination proceeding. We reasoned that the statute did not require the return of the child to a parental home where sexual abuse of several young girls had occurred in the past without evidence that the abuser in the home would change in the future would put the child at risk. We said, "Although a parent's emotional or mental incapacity or *physical neglect must be directly related to the child before the court,* that is not a requirement for termination based on sexual or physical abuse." *Id.* at 129 (emphasis supplied). The majority makes an unwarranted extension of our reasoning in *Miglioretto* in this case that is inconsistent with the legislature's intent in enacting the statute and with what we said in that case about what the state must prove under ORS 419.504(4). The state did not allege and there is no evidence that Rose or Faith was ever abused physically or sexually by either parent. Under the majority's reasoning, SOSCF will be able to take custody of children and terminate parental

---

[4] Now renumbered as ORS 419B.504(2).

rights to them on the basis of the previous neglect of a child, even though the parents are presently providing proper care to the child before the court.

To recapitulate the evidence regarding alleged neglect: Rose's pediatrician testified that Rose was in good health; Rose's developmental scores were about normal and were not cause for alarm to the worker who conducted the assessment; one of Rose's treating physician's and mother's aunt believed that mother had "bonded" with Rose; SOSCF evaluated the home as "neat and clean"; some of the environmental safety concerns were adequately addressed by the parents and the report about a loaded gun was determined by SOSCF to be unfounded. In every particular, the state has failed to prove its allegations of neglect by clear and convincing evidence. The majority is wrong to depart from the trial court's conclusion that the state failed to prove that mother was unfit due to physical and emotional neglect of Rose.

That leaves the allegations of emotional or mental illness or mental deficiency and the lack of effort to make the return of the children possible as potential grounds for termination.[5] The key to understanding the import of the evidence regarding these allegations begins with the uncontroverted fact that the removal of Rose from the home was triggered by mother's report of father's acts of violent behavior

---

[5] The majority said, "Our conclusion that mother physically and emotionally neglected her children is also supported by evidence that she is incapable of protecting her children from abuse and danger." 152 Or App at 598. That single sentence speaks volumes about a consistent flaw in the majority's analysis. In order to support its conclusion that the state had proven its allegation under ORS 419B.504(4) that mother neglected Rose, the majority relies on the use of evidence that ignores the distinction that the statute itself makes between evidence of the physical neglect of a child and evidence about the ability of a parent to provide care for a child. The latter focuses on the parent's parenting abilities while the former focuses on the particular level of care actually given to the child. ORS 419B.504(1) provides that a court in determining whether the rights of parents should be terminated because they are unfit shall consider whether parents suffer from an emotional illness, mental illness or mental deficiency of such nature and duration "as to render the parent incapable of providing proper care for the child for extended periods of time." In contrast, ORS 419B.504(4) says that the court shall consider any "[p]hysical neglect of the child." The majority's statement is telling because it illustrates an analytical method that lumps all of the evidence together to create an effect rather than requiring the state to prove its specific allegations by clear and convincing evidence.

against mother. SOSCF first became involved with the family in July 1994, when father threatened mother with a gun. When the state removed Rose from the home in January 1995, it was again as a result of a series of phone calls from mother to social workers reporting that father had "started threatening to kill [her]." But for these incidents, the state would never have petitioned to terminate the parental rights of the parties.[6] As a result, the proper inquiry is what connection, if any, the parents' mental conditions had to those incidents and whether the state has proven that those conditions are unlikely to change in the foreseeable future.

As importantly, the evidence in regard to the remaining allegations must be considered in light of the following time line:

(1)　April 1994:　Rose is born;

(2)　January 1995:　Rose is removed from the parents' custody;

---

[6] The SOSCF caseworker assigned to the family testified:

"Well there were two different reports of domestic violence. The first one concerned a—and I'm reading from the notes of [the public health worker] on 1/13/95, that said * * * he tried to choke her * * * and stuck a derringer to her throat, said if she left with the baby he'd find her and murder her. And mother said that he hadn't had his [methamphetamine] yet this morning.

"And I talked to [the public health worker] again on the 13th. The incident with the gun occurred Wednesday morning—I don't know what date that would have been offhand—occurred in the house. [The public health worker] hadn't asked if the derringer was loaded. She doesn't know where Rose was. The baby was—that was—it said that *the baby was dirty again, but that wasn't the reason for removal, in particular.*

"And then on the 24—I went out on the 20th, and [mother] said, "He just handed me the gun." She'd been mistaken. She did admit that they were fighting at the time in the kitchen and that Rose was awake in the living room. The living room is the next room—is adjacent to the kitchen in that house.

"* * * * *

"Then there was another call from [the public health worker] that [father] started threatening to kill [mother]. A * * * friend of [mother's] had called [the public health worker]—[mother] wants [the friend] to take the baby. [Father] wants the baby to go to it's sister's [father's adult daughter by a previous marriage] and [mother] doesn't want to leave the baby with [father] because of his temper.

"So those were the events that led up to the removal of the child." (Emphasis supplied.)

(3) March 1995: The Juvenile Court assumes jurisdiction over Rose;

(4) April 1995: SOSCF enters into a service agreement with mother and encourages father to engage in intensive and long-term therapy;

(5) June 2, 1995: SOSCF decides to file a petition to terminate the parents' parental rights to Rose;

(6) November 17, 1995: SOSCF files a petition to terminate parental rights as to Rose;

(7) May 3, 1996: Faith is born, and SOSCF immediately takes custody of her;

(8) June 28, 1996: SOSCF files a petition to terminate the parents' parental rights to Faith;

(9) September 1996: Trial is held on the petitions.

In April 1995, both parents participated in a comprehensive psychological evaluation conducted by Dr. James Ewell, a psychologist. The SOSCF worker who referred the parents to Ewell requested that the assessment address the following specific concerns:

"1. What are the barriers to either of these parents becoming viable parental resources?

"2. Can services be provided to meet the individual needs of these parents?

"3. Can these services be expected to produce the results of either parent becoming a safe parental resource in the time frame necessary for the almost-one-year-old child?"

During her interview with Ewell, mother reported that her father had left her mother when she was only three months old. When she was about five years old, her mother remarried and then divorced again when she was 12. After that, her mother began having a series of relationships with different men. Mother reported that one of those men sexually abused her from the time she was 14 years old until she was 18. Mother reported other instances of sexual abuse by an uncle and by one of her friend's boyfriends. Mother has never received any counseling regarding abuse, other than

talking to a school counselor. She admits to having a bad temper while in high school and that she would occasionally punch lockers or walls after becoming angry with other students. On at least one occasion, she was involved in a fist fight with another girl, and she was twice suspended from high school, once for fighting.

When mother was 13 or 14 years old, she became acquainted with father and would go to his residence to ride horses. After she turned 18, she moved into father's house, and she became pregnant. Mother described her relationship with father as being mutually emotional and physically volatile. She reported that a great deal of yelling and arguing occurred between them and that, on four different occasions, father had held a gun to her head and threatened to kill her. She told Ewell that on one occasion, she knocked out two of father's front teeth. She also reported numerous instances of them throwing things at each other.

At the time that Ewell interviewed mother, she was separated from father and reported that she did not intend to enter into any other intimate relationships within the near future. Based on his interview with mother, Ewell summarized in his written report:

> "[Mother] seemed very limited in her level of interpersonal understanding and perception. There was evidence of poor judgment and decision making. Throughout this evaluation interview, [mother] did not accept any responsibility for personal problems or wrongdoing. Her lack of understanding and insight went beyond that which could be explained by limited intellectual ability. Her extremely dysfunctional childhood and early life experiences have most likely combined to create a personality disorder, as well as cognitive impairment."

Ewell also conducted a battery of psychological tests. Mother's full scale intelligence quotient score of 79 placed her at approximately the eighth percentile, which is within the borderline range of intellectual deficiency, and just below the low average classification. Ewell explained in his report:

> "Individuals of [mother's] cognitive ability level often have difficulty with abstract forms of reasoning. They may also experience difficulty with social judgment and problem

solving. It would be expected that [mother] might be somewhat impaired in her ability to understand the needs of her child. This would be particularly true when considering the more emotional, less tangible needs."

Ewell concluded:

"[Mother's] cognitive deficiencies, her personality disorder and history of long-term sexual abuse within a highly dysfunctional family, all render her incapable of parenting at this time. Her level of social judgment, problem-solving and sensitivity are grossly impaired. Reasoning is highly concrete and nearly void of empathy. At the time of this assessment, [mother] did not seem to realize that any of these problems were in existence.

"[Mother] is in need of long-term, individualized psychotherapy. Intervention will need to be tailored to her own level of cognitive ability. I doubt that she would be able to benefit from group forms of intervention. The learning which took place within her childhood and the role models she had of how a family should function, were inadequate. In addition to insight oriented psychotherapy, [mother] will need to be taught basic skills of self-management and interpersonal communication.

"[Mother] will also require parenting classes and homemaker skill building. This case will necessitate long-term monitoring and supervision. The prognosis for change is poor. There is a high risk of [mother] entering intimate relationships with abusive, or otherwise domineering, men.

"In answer to [SOSCF's] specific questions, the barriers [mother] faces in becoming an appropriate parental resource include borderline intellectual ability, a personality disorder and the psycho/social confusion caused by years of living within a dysfunctional, sexualized family environment. As a result, she does not currently comprehend the devastating nature of these conditions and her own need to seek treatment. Under the most optimistic scenario, [mother] will probably require a year to two years of intensive intervention, followed by long-term monitoring and supervision. Without successfully completing this level of treatment, her condition is not likely to spontaneously improve."

At the trial held 18 months after his evaluation, Ewell testified that none of mother's diagnosed conditions—

personality disorder, past sexual abuse, or low IQ—would by themselves lead to a conclusion that mother was incapable of raising children. Significantly, Ewell never reevaluated mother or father after April 1995 and after they were involved in various personal or parenting enhancement programs. His testimony at trial was based on evaluations that occurred *before* mother completed her efforts to improve her parenting abilities.

Mother offered evidence that after Rose had been removed from her custody in January 1995, she, on her own initiative, enrolled in a parenting class that was specifically designed to address the needs of parents with cognitive disabilities. The class lasted for approximately 30 weeks and was structured in three terms around a traditional academic schedule. It began in October 1995 and concluded in June 1996. Mother's evidence indicates that she attended regularly and participated fully and diligently until she gave birth to Faith in May 1996. At trial, Ewing testified that he found it significant that, on her own and without the compulsion of a court order, mother had voluntarily gone to parenting classes and completed them. Her SOSCF caseworkers testified, however, that even though she was attending the class, her parenting skills that they observed during supervised visits with Rose did not visibly improve. Of course, that testimony must be tempered by the facts that SOSCF had already decided to terminate mother's rights in June 1995 and that mother has never had custody of Rose and Faith since January 1995.

Shortly after Rose was removed, SOSCF entered into a service agreement with mother that required mother to obtain a substance abuse evaluation, a psychological evaluation, to keep appointments with SOSCF workers and to maintain a regular visitation schedule with Rose. Mother complied with *all* of these requirements. Nevertheless, SOSCF decided to petition to terminate her parental rights before she completed the requirements. Even more indicative of SOSCF's approach is the fact that SOSCF did not seek to help mother deal with domestic abuse after Rose was removed; the very problem that had prompted Rose's removal from mother's custody. At trial, mother's SOSCF caseworker testified:

"Q. Well, realistically, you have control of her child. In fact, your agency has continued to have control of her child since January of 1995. So why couldn't you say to her, '[Mother], we have a concern about domestic violence. We have groups that can help you. If you want the child back, go to those groups'? I mean, you clearly had the power to do that, didn't you?

"A. Yeah, I could have done that, and my response would have been that—you know, as far as the initial service agreement, it seemed to me like the things in the initial service agreement were the first steps. Domestic violence would be something that we'd look at further down the road, when we had a psychological evaluation that—you know, it—I was looking for the big picture at first of wanting to know what I was dealing with this person and, you know, what would she need in the big picture rather than simply plugging her into a specific service.

"Q. * * * did anybody at your agency ever offer [mother]—

"A. I really don't know."

Finally, there is no evidence in the record that SOSCF ever made it clear to mother after Rose was removed, that the return of Rose and Faith was dependent on her demonstrating her ability to deal constructively with the potential of domestic abuse (the major problem in the home).

The defect in the majority opinion regarding neglect runs as a common thread in its treatment of the remaining issues. It declines to focus on what occurred between January 1995 when Rose was removed and the date of trial. In June 1995, SOSCF was aware of all the above circumstances. Yet, the agency's response to mother's efforts to get Rose back was its decision on June 2, 1995, to petition to terminate mother's parental rights. The mandate of the statute is clear: the ability of the parent to change in the foreseeable future must be "improbable" and that fact must be demonstrated by evidence that is clear and convincing. When the reason for the removal of Rose from the family home is properly considered along with what occurred within the relevant time period, it can hardly be said that the state has met its burden. As a matter of law, that's not the "stuff" of which clear and convincing evidence is made.

I turn to the evidence as to father regarding the remaining allegations. Although father's conduct could have put Rose in danger of harm, it was not directed at her. In fact, according to the home nurse who visited mother and father while they had custody of Rose, father interacted with Rose and had established a close bond with her before she was removed from the home. As will become apparent, the major thrust of the state's evidence comes from a time period that preceded father's participation in anger management and parenting classes. It is accurate that the conduct against father's ex-wife before 1975, as testified to by his daughters, his treatment of mother, and the baseball bat incident after his strokes suggest that he will continue to be abusive in the future. However, that evidence is offset somewhat by the fact that there are no reports of abusive conduct between 1975 and 1993. Moreover, it is uncontroverted that father underwent medical treatment for a health condition that apparently was related to his problems with anger after Rose was removed. Significantly, no witness testified to incidents of violence committed by father after his surgery, even though the trial was not held until September 1996.

The medical evidence from father's physicians regarding father's condition is as follows: Father sought treatment in 1992 for symptoms that were later attributed to his having had a stroke. The stroke was caused by the restriction of one of father's carotid arteries, which in turn decreased the amount of oxygen reaching portions of father's brain. The restriction of the arteries predated the strokes by some unknown period of time and it is medically probable that he experienced "transient ischemic attacks" (TIA's) before he had the stroke. The TIA's would have caused stroke-like symptoms without causing permanent brain damage. The loss of oxygen due to the stroke, however, caused organic brain damage, which provides a neurological explanation for father's stroke symptoms which included loss of cognitive ability, aphasia,[7] frustration, depression and worry. His treatment included vascular surgery to relieve the

---

[7] Aphasia is "the loss or impairment of the power to use words as symbols of ideas that results from a brain lesion." Webster's Third New International Dictionary, 99 (1993).

restriction. It is unclear from the record exactly when the surgery took place except that it occurred after Ewell evaluated father in April 1995 and before Grosscup's evaluation in August 1996.

The majority says that no witness testified that there was a correlation between father's abusive conduct and his medical condition and concludes that "there is clear and convincing evidence in this record that indicates that father's mental problems and behavior are not related to his strokes." 152 Or App at 578-79.[8] Both assertions are erroneous.

The first assertion is contrary to the testimony of father's physicians as well as the testimony of the state's principle expert witness, psychologist Dr. Ewell. Ewell testified:

> "[S]ome of those delusions, may in fact be neurologically caused. So I guess *the best I can say is that I think the relationship is that possibly some of these delusions have a neurological base,* but it is possible that they do not." (Emphasis supplied.)

In addition to his acknowledgment that father's delusions could have been caused by his neurological condition, Ewell testified that "individuals who have persecutory delusions or have paranoid kinds of thoughts do sometimes act on those thoughts, thinking other people are out to harm them, even their spouses, and react physically or in a violent way to them." Ewell also confirmed that he had experience treating "individuals who've had neurological problems that have caused delusions, *and in those cases I believe that medication has been at least somewhat helpful.*" (Emphasis supplied.)

Father's physician testified that in addition to the vascular surgery performed to improve the oxygen supply to father's brain, his treatment included medication and that father's symptoms of frustration, depression and worry had improved. Also, father's physicians testified that they believe

---

[8] The majority is apparently also relying on the testimony of father's daughters that he was paranoid and delusional many years before his stroke. While their testimony regarding father's conduct is credible, they were not qualified as experts to make medical or psychological conclusions about father's mental condition. Accordingly, their testimony in that regard ought to be given no weight at all.

that there is no physical reason why father could not parent his children. Besides Ewell's and the physicians' testimony, Zacklin, a retired military noncommissioned medical officer who was familiar with the family, testified that after the medical treatment, father ceased being "delusional" and became "a lot more calm, * * * a lot more under control."

Additionally, Dr. Grosscup, who examined father after Rose was removed and after father had undergone surgery, presented equivocal testimony about father's present ability to parent. Grosscup testified that father has a schizophrenic disorder and a major depressive disorder, both related to his medical condition. She opined that his prognosis is "extremely poor" even if his difficulties are neurologically based. On the other hand, she also testified that she did not "see anything to suggest [that father] should have no contact" with his children. Ultimately, when asked, in substance, the "bottom line" question about whether his parental rights should be terminated, she replied, "I'm in the gray area." Opinions in the "gray area" hardly equate to "clear and convincing" evidence. For these reasons, the testimony of Grosscup and Ewell cannot legally suffice to meet the state's burden that it is highly probable that father is unable to parent now and in the future due to conduct or conditions not likely to change.

In summary, the evidence is uncontroverted that because of the TIA's, father probably experienced stroke-like symptoms for years before Rose was born. Sometime in 1992 or before, father experienced a stroke that caused organic brain damage, which could have caused or contributed to the delusional behavior observed by many of the state's witnesses. After Rose was removed from his custody, father sought and obtained medical treatment, including vascular surgery and medication, and his symptoms improved. Significantly, Dr. Grosscup, the *only* psychologist to evaluate father *after* he obtained medical treatment, was not able to express an opinion in favor of permanently terminating his parental rights. Again, I am hard-pressed to understand how the state's evidence rises to the level of the clear and convincing standard that the law requires under the above circumstances.

There is another factor regarding father that weighs against the conclusion that the state has carried its statutory burden: the absence of efforts by SOSCF to offer services to him after Rose was taken into custody. Father was told by SOSCF to obtain a psychological evaluation, to get a drug and alcohol evaluation and to participate in visitation with Rose. Thereafter, father and mother continued to visit regularly with Rose. In April 1995, their caseworker received Ewell's psychological evaluation, and she told father that she wanted him to undergo intensive psychotherapy as recommended in the evaluation. She also told him that he had a deadline to obtain the therapy. However, SOSCF did not offer in any way to facilitate the implementation of such a program for his benefit. Nonetheless, father agreed to commence therapy within 30 days. On June 23, 1995, the caseworker met with the parents and informed them that SOSCF was going to seek termination of their parental rights. After he was informed of that fact, father rejected the notion of therapy and told SOSCF that he would oppose its decision to terminate his parental rights. Three months had elapsed since Rose had been found within the jurisdiction of the court and 60 days had passed since the caseworker had demanded that father become involved in therapy. Apparently, SOSCF's decision created an adversarial relationship with father that stalled any efforts on his part to become involved in a therapy program. Nonetheless, father thereafter continued to be involved in other programs designed to help him.

Father's counsel aptly summarizes the effect on his client as a result of the above circumstances and SOSCF's hasty decision to terminate:

"[Father] has taken an anger management class and done well in it; he has shown he has no problems with drugs or alcohol; he has obtained treatment for the neurological problems caused by his strokes. He has taken some 30 weeks of parenting classes; and he has consistently visited with Rose. No one knows how these changes have affected father's parenting abilities. With respect to Faith, a child father has hardly met (perhaps not met at all, the record is unclear), we have *never* seen how successful or inadequate his parenting is. But even if father has not effected changes,

he deserves the chance to make them."[9] (Emphasis in original.)

These kinds of cases are not easy to decide. Because children are involved, there is a temptation to overlook the policy of the law regarding termination of parental rights that transcends every case like this one. However, we must be mindful that the termination of parental rights severs the fundamental liberty of natural parents to care for and have the custody of their children. *Santosky v. Kramer*, 455 US 745, 71 L Ed 2d 5999, 102 S Ct 1388 (1982). Termination of parental rights is forever. It is for that reason that the legislature has decreed that the state must prove the statutory requirements by clear and convincing evidence or, in this case, evidence that makes it highly improbable that the children can be returned to father and mother's home in the foreseeable future.[10] The burden that is on the state in this case exists to protect a fundamental right of all parents, and we should be circumspect about following the statutory requirement of proof in every case, regardless of the emotional pull to place the children in an environment more conducive to their well-being.[11] Otherwise, we establish a precedent that lowers the threshold standard for termination of parental rights and we, in effect, instruct SOSCF to act accordingly, to the detriment of all Oregon citizens.

I have examined separately the evidence of neglect and the conduct and mental and emotional conditions of father and mother for the purpose of determining whether the state has proven that those circumstances are not likely

---

[9] There is no rule of law that dictates a particular outcome depending on services actually offered. *State ex rel CSD v. Rollins*, 322 Or 599, 603, 910 P2d 1107 (1996).

[10] In *State ex rel Juv. Dept. v. Habas*, 299 Or 177, 186-87, 700 P2d 225 (1985), the Supreme Court said, "Although we recognize that the legislature considers the interest of the child to be paramount, nevertheless, the legislature also recognizes that parental termination is the last resort after all other interventions of social services have failed."

[11] It is worth repeating that in *State v. McMaster*, 259 Or 291, 486 P2d 572 (1971), the court recognized the constitutional implications of terminating parental rights. The court said, "[W]e do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do." *Id.* at 303.

to change in the foreseeable future. Although the majority has garnered volumes of evidence to support its position, all of that evidence suffers from the same flaw. It predates the 60-day period in the spring of 1995 within which SOSCF first offered services to the parties and then decided to terminate their parental rights. There is little or no evidence that is probative of the parents' condition after father's surgery and the parties' participation in numerous programs, even though the termination trial was not held until the fall of 1996. The proof regarding each allegation is inadequate when considered in light of the state's burden. Although it does not necessarily follow that the sum of the parts is also inadequate, the state is required to prove at least one of its alleged grounds for termination. It has not accomplished that task when all the evidence is considered in regard to the general allegation that parental rights ought to be terminated "by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change." Father's claim that he and mother have never had an opportunity to demonstrate their ability to meet SOSCF's concerns rings with accuracy.

Protection for the children would not end if we were to reverse the judgment in this case. They would remain under the jurisdiction of the trial court, and their care would be subject to its supervision. If it were highly probable that father's past abuse of others would repeat itself and endanger Rose and Faith's welfare in the foreseeable future, I would not hesitate to affirm the trial court. But, the state's "rush" to seek termination prevented it from making that showing. In light of the constitutional implication that this decision has, I cannot hold in good conscience on these facts that the state has carried its statutory burden.

Accordingly, I must dissent.

Warren and Armstrong, JJ., join in this dissent.